## ANDERSON et al. v. UNITED STATES.

No. 10.   Argued October 21, 22, 1942.—Decided March 1, 1943.

*Mr. Daniel William Leider* argued the cause, and *Messrs. Lee Pressman* and *Nathan Witt* were on the brief, for petitioners.

*Assistant Attorney General Berge,* with whom *Solicitor General Fahy* and *Messrs. Oscar A. Provost, Archibald Cox,* and *Andrew F. Oehmann* were on the brief, for the United States.

Mr. Justice Frankfurter delivered the opinion of the Court.

The petitioners were convicted, in the District Court for the Eastern District of Tennessee, of conspiring to damage property owned by the Tennessee Valley Authority, a corporation in which the United States is a stockholder, in violation of §§ 35 (C) and 37 of the Criminal Code as amended (18 U. S. C. §§ 82, 88). The Circuit Court of Appeals for the Sixth Circuit affirmed the convictions, 124 F. 2d 58, and we brought the case here because it presented serious questions in the administration of federal criminal justice, 316 U. S. 651. The questions are similar to those decided in *McNabb* v. *United States,* *ante,* p. 332. The two cases were argued at the same time and, as will appear from a short summary of a long record, are governed by the same considerations.[1]

---

[1] As in the *McNabb* case, there are no specific findings here as to the circumstances in which the incriminating statements in controversy were admitted against the petitioners. When these statements (excepting the confessions of three petitioners) were offered in evidence, the petitioners objected, and the trial court held a hearing in the absence of the jury to determine whether the statements were "voluntary." At the conclusion of this preliminary examination, the court overruled objections to the admissibility of these statements. The jury was recalled and the same testimony was repeated. The evidence relating to the confessions of three of the petitioners was, by stipulation, heard only once and in the presence of the jury. Referring to all this evidence as "certain parts of the proof," the judge thus charged the jury regarding the admission of these incriminating statements: "There has been allowed for your consideration certain statements, confessions, or admissions alleged to have been made by some of the defendants. It is primarily for the Court to determine whether or not such statements are admissible for your consideration but it is wholly for you to determine how much weight or credit you will give to these statements." We shall assume as facts, therefore, only the testimony of Government witnesses and so much of the petitioners' evidence as is uncontradicted.

In July 1939, the International Union of Mine, Mill and Smelter Workers struck against the Tennessee Copper Company's mines at Copperhill, Polk County, Tennessee. The strike was followed by a shut-down, but the mines were reopened in August after the sheriff brought in a number of special deputies who were in the company's pay. It was one of those obdurate mining strikes, and it continued into April of 1940, when the violence which gave rise to this prosecution occurred. On April 1st the company's operations were interrupted by the dynamiting of two power lines, owned by the TVA, from which the company obtained the power necessary for its activities. On April 14th two steel towers were dynamited. Two days later two special agents of the Federal Bureau of Investigation arrived in Copperhill to investigate the explosions. On April 24th two more power lines were blown down.

Thereupon, on the same day, the sheriff on his own initiative began to take into custody strikers, including the eight petitioners, whom he suspected of participation in the dynamiting. These arrests were made without warrant. With commendable candor in regard to this and other misconduct of officers of the law, the Government does not defend the legality of the arrests.[2] The men were not taken before any magistrate or other committing officer, as required by Tennessee law. Michie's Code (1938) § 11515. Instead they were taken to the company-owned Y. M. C. A. building in Copperhill, which was being used by the sheriff and his special deputies as their headquarters. On April 24th and 25th six more special agents of the Federal Bureau of Investigation arrived in Copperhill to assist in the investigation.

---

[2] Under Tennessee law an officer may arrest without a warrant when a felony has in fact been committed, and he has reasonable grounds for believing that the person arrested has committed it. Michie's Code (1938) § 11536. But willful destruction of power lines is only a misdemeanor under state law. *Id.*, § 10863 (8).

While the petitioners, with at least thirteen others, were thus held in custody at the Y. M. C. A. by the state officers, they were questioned by the federal agents intermittently over a period of six days during which they saw neither friends, relatives, nor counsel. Incriminating statements from six of the petitioners were the fruit of this interrogation. To determine whether these statements were properly admitted in evidence, it is necessary to particularize the circumstances under which each confession was made.

*Simonds.* Simonds was arrested by two deputies on the afternoon of Wednesday, April 24th, and taken directly to the Y. M. C. A. After spending the night at the county jail, he was questioned by one of the federal agents for about an hour Thursday morning at the Y. M. C. A. The questioning was resumed at two o'clock in the afternoon by three agents who talked with him for about two hours; at seven o'clock that evening he was again questioned by two agents for another two hours. On Friday morning he was questioned for about an hour. And on Saturday he was questioned at three different periods throughout the afternoon and evening, each period lasting about half an hour. He was again questioned on Sunday afternoon for about an hour by two agents, one of whom described what occurred then as follows: "We went over the entire case with him, and pointed out the discrepancies in his story and the information we had developed on investigation, which knocked down his alibi, and out of a clear sky he said 'well, I want to tell you I am guilty.'" One of the agents thereupon took Simonds' written statement.

*Hubbard.* Hubbard was arrested by two deputies on Wednesday evening, April 24th, and taken to the Y. M. C. A. He, too, spent the night in the county jail. He was questioned by four agents at the Y. M. C. A. on Thursday afternoon for about two hours. Two of the

agents questioned him again that evening for about two hours. At two o'clock Friday afternoon he was questioned for about forty-five minutes; at five o'clock he was questioned for another hour and a half. At seven-thirty Friday evening two agents questioned him for two more hours. He was questioned intermittently all day Saturday. One agent questioned him for periods of fifteen minutes two or three times during the morning and afternoon. Another questioned him for half an hour in the morning. A third agent talked with him for another two hours sometime during the day. And he was questioned again for about twenty minutes at six o'clock in the evening. He was not questioned on Sunday, but he was present during the questioning of Simonds by the federal officers that morning. After hearing Simonds admit his guilt, Hubbard also confessed.

*Woodward.* Woodward was also arrested on Wednesday afternoon, April 24th, by two deputies who took him first to the Y. M. C. A. and then to the county jail. He was questioned by four federal officers for about two hours Thursday afternoon, and questioned again for another two hours that night. The officers questioned him for about fifteen minutes on Saturday. On Sunday he was brought into the room where Simonds and Hubbard were, and upon being confronted with their confessions, also confessed. On Monday the officers spent about five hours, from 11 a. m. until 2 p. m. and from about 3:30 until 7 or 7:30 p. m., questioning him in order to reduce his confession to writing. The manner of Woodward in giving his statement was thus described by the agent who questioned him: "He had considerable difficulty in recalling the details, he said his mind was not exactly clear on all of it, it took a good while in order to get the details of it, of how it happened, everything in the chronological order of events, and he also complained on occasions that his mind was befuddled in making the statement, upon

relating about what he had done, and that is the reason it took so long to do it. It took the morning and the greater part of the afternoon."

*Rhodes.* Rhodes was arrested Sunday night, April 28th, and spent that night in the jail, sharing a cell with Woodward, Hubbard, Simonds, and Queen. He was questioned for about two hours by two agents on Monday morning, and then confessed.

*Queen.* Queen was arrested by two deputies on Sunday afternoon, April 28th, and was taken to the Y. M. C. A. After spending the night in jail, he was questioned for about an hour the following night by three agents. Upon being confronted with the confessions of the others, he admitted his guilt.

*Ballew.* Ballew was arrested by three deputies on Tuesday afternoon, April 30th, and taken to the Y. M. C. A. He was questioned there for about an hour by two federal officers. After spending the night in jail, he confessed the following morning.

The question for decision is whether these confessions—repudiated when those who made them took the witness stand at the trial—were properly admitted in evidence against all the petitioners, including Anderson and Ellis who did not confess. In the *McNabb* case we have held, *ante,* p. 332, that incriminating statements obtained under the circumstances set forth in that opinion cannot be made the basis of convictions in the federal courts. The considerations which led to that decision also govern this case. The detention of the petitioners by state officers was, as the Government concedes, in violation of the Tennessee statute which provides that "No person can be committed to prison for any criminal matter, until examination thereof be first had before some magistrate." Michie's Code (1938) § 11515. The courts of Tennessee exact scrupulous observance of this prohibition by its law officers. See *Polk* v. *State,* 170 Tenn. 270, 94 S. W. 2d 394; *State*

*ex rel. Morris* v. *National Surety Co.,* 162 Tenn. 547, 39 S. W. 2d 581.

Unaided by relatives, friends, or counsel, the men were unlawfully held, some for days, and subjected to long questioning in the hostile atmosphere of a small company-dominated mining town. The men were not arrested by the federal officers until April 30th, and only then were they arraigned before a United States commissioner, except for Ballew who was not arraigned until May 2nd or 3rd. There was a working arrangement between the federal officers and the sheriff of Polk County which made possible the abuses revealed by this record. Therefore, the fact that the federal officers themselves were not formally guilty of illegal conduct does not affect the admissibility of the evidence which they secured improperly through collaboration with state officers. *Gambino* v. *United States,* 275 U. S. 310, 314; *Byars* v. *United States,* 273 U. S. 28, 33–34.

The Government urges that, even if the confessions are held to be inadmissible, only the convictions of the six petitioners who confessed should be reversed. The prosecution rested principally on these confessions and the testimony of an informant, Freed Long, whose credibility was under severe attack. The incriminating statement of each petitioner implicated all the others, including those who did not confess. To be sure, the trial court devised a procedure under which the confessions were introduced without mention of the names of the other persons implicated. But their names were in fact revealed in the course of the cross-examination of the confessing petitioners. So also, while the trial judge appeared to admit the confessions "only to be used against the persons who made them," his charge bound the jury to no such restricted use of the confessions. On the contrary, from what the trial judge told them the jury had every right to assume that in ascertaining the guilt or

innocence of each defendant they could consider the whole proof made at the trial. There is no reason to believe, therefore, that confessions which came before the jury as an organic tissue of proof can be severed and given distributive significance by holding that they had a major share in the conviction of some of the petitioners and none at all as to the others. Since it was error to admit these confessions, we see no escape from the conclusion that the convictions of all the petitioners must be set aside.

*Reversed.*

MR. JUSTICE JACKSON and MR. JUSTICE RUTLEDGE took no part in the consideration or decision of this case.

MR. JUSTICE REED dissents.