UNITED STATES v. HOFFMAN.

No. 315.

Circuit Court of Appeals, Second Circuit.

July 26, 1943.

Joseph S. Byrne, of Brooklyn, N. Y. (Byrne & Byrne, of Brooklyn, N. Y., on the brief), for defendant-appellant.

Vine H. Smith, Asst. U. S. Atty., of Brooklyn, N. Y. (Harold M. Kennedy, U. S. Atty., of Brooklyn, N. Y., on the brief), for plaintiff-appellee.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Defendant, Robert Carl Hoffman, a youth of twenty, having been found guilty by a jury of failing to report for induction into the Army of the United States, appeals from the judgment and sentence by the court to the maximum term of imprisonment of five years provided by the statute, 50 U.S.C.A. Appendix, § 311. While defendant's own testimony was sharply in conflict with the evidence for the prosecution, there was clearly evi-

dence to sustain the conviction and the question before us is whether reversal is required by errors in the trial.

Defendant was born in Germany on July 6, 1922, of a German mother and an American father, a soldier who had served in the American Army of Occupation in Germany following the armistice of 1918. He was brought to this country as an infant and has resided here since. On September 25, 1942, he filed his Selective Service questionnaire with his Draft Board, but attached to it a letter in his handwriting, which expressed his unwillingness to fight against his German relatives or to serve except on condition that he be placed in a noncombatant unit for service within the defined boundaries of the United States. The importance of this letter in the case compels quotation. Addressed "To Whom it may concern," it stated that the writer felt it his duty to make known "the following facts" as to his service in the armed forces of the United States, and that though he was "most certainly a Catholic," yet his religion did not instruct him to be against war or to be a conscientious objector, though he felt his conscience "does rule me in this matter." It continued:

"I am German born, of a German born mother. Many relatives, on my mother's side are now residing in Germany. To fight against these people would be to destroy my own family. I care not if they are Nazi's or otherwise. I consider myself a part of them and they a part of me. Nor could I force myself to fight against any of German's allies. They are Germany's friends and thereby are the friends of part of my family. I could never in all clearness of conscience, cut their throats.

"Once again, I wish to make it known. Religious training does not enter into this matter.

"In regard to serving the United States of America, I hereby declare:

"I will serve the American Army on the following conditions:

"1st—That I be placed in a *non-combattant* unit and—

"2nd. That this unit will be of serve *only* within the defined boundaries of the United States of America.

"I have a knowledge of stenography. Perhaps, I can be of some service in the clerical field."

And it ended, "For considering this statement, the reader has my full appreciation."

Obviously such an attitude as was here disclosed could lead only to trouble if persisted in. The country's laws require military service of its citizens even with enemy relatives; and other young men in similar positions have had to respond, and have done so without cavil. Indeed, after this letter the question for the various public officials involved was substantially whether attempts at dissuasion were worth while, or whether, as they seem soon to have concluded, speedy trial and incarceration was the only outcome to be looked for.

Thereafter, as was his right, defendant requested a hearing of the Board, which was granted him on October 6, 1942. A member of the Draft Board testified at the trial that defendant was asked whether his objection equally applied to Japan and Italy and that he answered that it did, that they "were allied with Germany and that he would feel equally in their case that, if he were to serve, he would be cutting the throats of his relatives in Germany. The Board then told him they felt that he was misinformed and misguided, and asked if he had discussed his position with his pastor. He said he had not; and the Board recommended that he see his pastor and discuss the case and report back to the Board."

Although defendant attempted to show at the trial that he had talked with his priest, who advised him to serve, and that he had so reported to the Board, this hearing seems to be the only personal contact he had with the Board itself, which proceeded to his classification in apparently routine manner. He had been directed to go to a doctor at Laurelton, Long Island, for his physical examination and Wasserman test, which he did; and he was classified 1-A on October 8. He was then directed to report for induction into the Army on November 24, 1942, at 8 a. m. at the Board's quarters in Jamaica, Long Island. The charge against him is that "he, the said defendant, did unlawfully, wilfully, and knowingly fail and neglect to report for such induction at the time and placed [sic] fixed in said notice." What transpired on that morning is the crux of the case. But the trial developed the sharpest conflict between the two persons present, Miss Ellen Mathews, the

chief clerk of the Board, and defendant. Admittedly defendant did not appear at that hour, but did appear later in the morning. Miss Mathews testified that he appeared at about 10:30 a.m., but definitely refused to serve, as "he figured that the United States has stabbed Italy and Japan in the back." He himself testified that he came at about 9, having talked with his priest and being prepared to go, as he stated to Miss Mathews. Miss Mathews also testified that it was the custom of the Board to send late arrivals to the Grand Central Station, for which the other registrants had already left, but that she did not follow that course in this case because of defendant's refusal to serve. She stated that she directed him to appear that night for a conference with the appeal agent, while his version was that he was to come back that night "and consult with the F. B. I."

Since it was conceded that defendant's delay in arrival would not alone have been regarded as harmful—and this accords with the Regulations, 32 CFR, 1941 Supp., 633.12(b)—the real question is as to his intent when he arrived; and this is the issue which the court submitted to the jury. This seems proper; the statute requires something more than mere failure, for the accused must "knowingly fail or neglect to perform" a statutory duty. 50 U.S.C.A. Appendix, § 311; United States v. Trypuc, 2 Cir., June 11, 1943, 136 F.2d 900. That the court interpreted this language as meaning the usual criminal intent seems also correct. Cf. Nosowitz v. United States, 2 Cir., 282 F. 575, 578; United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381; Townsend v. United States, 68 App.D.C. 223, 95 F.2d 352, certiorari denied 303 U.S. 664, 58 S.Ct. 830, 82 L.Ed. 1121. As bearing upon this point the court admitted defendant's letter of September 25 over his objection, as well as certain statements, not objected to, made by him to F. B. I. agents after his arrest. And in its charge the court read the letter in full to the jury, saying, "Well, he has that presumption—and I cannot avoid using the phrase in describing the letter—to state on what conditions he will serve," and that "this letter expresses an attitude of mind which is important perhaps only in this case so far as it bears on whether he was or was not willful in his failure to report for induction." And it also

referred to the statements taken by the F. B. I. as "further evidence of that state of mind in respect to willfulness" and "which in effect confirm the original expression of the letter of September 25, 1942."

Defendant now assigns as reversible error the admission of these documents as being wholly without the indictment and particularly calculated to inflame the minds of the jury. Passing for the moment a question discussed below as to the admissibility of the statements to the F. B. I., it seems clear, nevertheless, that however inflammatory the statements were, they were properly admissible on the question of intent, the central point of the case. Only as the jury had the background of defendant's approach to selective service in the armed forces would they be able properly to appraise his conduct at the time of induction. But if this is true, we think it equally clear that certain testimony offered by defendant and excluded by the court dealing with the reason for his delay in appearing for induction was also admissible. The fact that he appeared at all somewhat tended to show that his attitude was not one of complete defiance, as did also his response to the other requirements, such as taking the physical examination. If he had a reasonable and natural excuse for his delay, that would bear directly upon his intent and hence upon the issue between himself and Miss Mathews.

Nevertheless, while statements as to his intent at other times than on the morning in question were admitted for the prosecution, his own attempts to show a natural reason for his delay, and thus to negative proof of his defiance, were rigorously checked. The direct question as to what delayed him was excluded, as well as questions both to him and to his father, designed to show that he had gotten up preparatory to reporting for induction when his mother became hysterical and fainted, and that he and his father tried to attend her and finally put her to bed, after which he left for induction. As having some bearing, too, on the issue, evidence should have been taken, as offered, that he had given up his job as messenger, stock and mail clerk, and elevator man for a Catholic religious publishing house, and that his associates had given him a gift against his induction. In this connection it was surprising that the father's testi-

mony of the young man's racial background, including the witness' own service in the Army of Occupation in Germany—where he had met the mother—was excluded, even though this had already come in indirectly from the letter above quoted and from the statements given the F. B. I.

In view of the importance of the issue as to the young man's state of mind, we think it clear that he was entitled to the same leeway given the Government in proving the background facts, and that the restrictions thus placed upon his evidence unfairly hampered his proof. The question then becomes whether other evidence so strongly confirmed the Government's case as to make it clear beyond doubt that these restrictions could not have prejudiced the result.

There was other evidence, relied upon by the prosecution as doing just that, from Mr. Hemley, a lawyer and the local associate appeal agent, and from the statements to and testimony of the F. B. I. agent, which must now be appraised. On the night of what should have been his induction, defendant appeared at the Board office, as Miss Mathews had told him to do, and was directed to Mr. Hemley. The exact purpose of his being sent to an appeal agent is not clear; certainly he was then no longer in a position to appeal, 32 CFR, 1941 Supp., 627.2(c). In any event, Mr. Hemley's own testimony shows no attempt to persuade or guide, but only an examination to establish the truth of the case made against defendant by Miss Mathews—that he had purposely refrained from coming at the required time, because he did not wish to fight against Germany or its allies, but would fight for Germany, because the cause of the Axis was the correct one (statements going beyond any of the written ones in evidence). Defendant's own version of this interview is, of course, entirely different and to the effect that he stated he was ready to serve.

A week later, December 1, defendant appeared of his own accord at the Board office, as he says, to find out why he had not been inducted, since he had given up his job to go into the Army and was not supporting his family. But Mr. Hemley, to whom he was referred, testified that he came to ask why he had not been arrested; and upon being questioned, he again reiterated that he would not fight against Japan, Italy, or Germany, since he would be cutting the throats of his own family, admitted that he had said previously that he would fight for Germany against the United States, and to the inquiry whether he still felt that way, replied that he did. He was then told to go home and await arrest. Mr. Hemley said that certain Board members came in to hear the conversation, but it appears that they did not participate nor did they testify as to it. Of course, the jury could properly accept Hemley's rather than defendant's version of this incident; but it is clear in any event that defendant did come in to talk matters over. This appears inconsistent with a mere continued defiance and at least suggests the possibility of a reaching for a face-saving formula, a purpose which, if entertained, certainly withered before an examination perfecting the case against him.

 The high quality of service rendered by draft board members and the difficult problems they meet constantly are too well known to leave any room for the suggestion here that the members should have been expected to afford the time for, or take the responsibility of, attempting to set a misguided boy aright, rather than to leave him to the mercies of subordinates, who, however well-intentioned, could hardly avoid an interest in justifying the original action taken. But when his case has become individualized for us by a judgment which makes him a convicted felon, we must note that only from these two witnesses—Miss Mathews and Mr. Hemley—comes the vitally important evidence not merely of his unqualified refusal to serve, but also of a definite feeling against his own country and for its enemies—sentiments going beyond his written expressions and, indeed, repudiated by him before the F. B. I. agent. We think, therefore, that this testimony alone would not justify the overlooking of errors otherwise prejudicial.

 Next we must consider the statements given the F. B. I. Defendant was arrested by F. B. I. agents on December 23 and taken to the Federal Building in Brooklyn, where he was questioned by Mr. De Meo, the government prosecutor in this case. At that time he signed a statement, witnessed by Mr. Walsh, the F. B. I. agent who testified. He gave another statement on December 24, with an addendum on December 26, both from

the Federal House of Detention in New York City. Whether these were made before his arraignment is not clear. Mr. Walsh testified that immediately upon his apprehension, defendant was brought before Mr. De Meo, "and there [then?] was again questioned by Mr. De Meo, and was later arraigned" before the United States Commissioner. Whether "later" was a matter of hours or days does not appear. The facts that the Commissioner allowed his release on moderate bail and that he was still in detention when even the later statements were given suggest that all preceded arraignment. If so, they were not admissible against him under the cases of McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. ——, and Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. ——, both decided March 1, 1943, and United States v. Haupt et al., 7 Cir., 136 F.2d 661, decided June 29, 1943. These cases appear to make it clear that even the voluntary character of statements prior to arraignment does not make them admissible. See Proposed Federal Rules of Criminal Procedure, Rule 5, and Committee Note thereto.

▮▮▮▮ But in view of the doubt left in the record as to this point, and since this issue was not made below (the cases not having then been decided), we have considered whether the effect of these statements should be to conclude defendant's guilt. We think they cannot be given such an effect. Each contains a statement as to his birth, parentage, and early history; each reiterates that he would not fight against his German relatives, with an added claim that his religion teaches him not to kill a man except in self-defense; and each states that he will go to jail or prefers to remain in jail before serving in the United States Army overseas or in a foreign country. But service overseas or in foreign countries is emphasized; and it is stated, "I would urge war against them [my relatives in Germany] in the event our country was invaded by Germany." This is supported by the Government's testimony of Mr. De Meo's stenographer that he told Mr. De Meo he was ready to be inducted into the Army with the understanding that he would not go outside the country; he would not fight against Germany and he would not fight "unless this country were invaded." Further, as the testimony and the document itself showed, he struck out

from the statement prepared by the F. B. I. an expression that he looked upon everyone as his brother, whether German, Japanese, Italian, or Russian, "and it makes no difference to me who wins the war," as this did not represent his views—which may be contrasted with the Mathews and Hemley testimony discussed above. The court, however, excluded a question as to his attitude only four weeks later, at his trial—whether he was "still ready" to join the Army at any time.

Defendant says these exhibits disclose that at no time did he refuse to be inducted. While this matter was evidential of what his attitude was on induction day, guilt would not be established unless he did refuse to be inducted. Indeed, under the Selective Draft Act of 1917, 50 U.S. C.A. Appendix, § 201 et seq., it was well settled that a draftee could be inducted against his will, and thus made subject to military discipline, United States ex rel. Bergdoll v. Drum, 2 Cir., 107 F.2d 897, 129 A.L.R. 1165, certiorari denied 310 U.S. 648, 60 S.Ct. 1098, 84 L.Ed. 1414, and cases cited, though that is not the practice under the present law, 50 U.S.C.A. Appendix, § 311, supra, and 32 CFR, 1941 Supp., 633.12(b), supra; Billings v. Truesdell, 10 Cir., 135 F.2d 505. But there seems no ground for declining to receive him if he is willing to be inducted, even though expressing an intent to serve only in this country. With the latter—unless and until it becomes a refusal to be inducted—the Draft Board has nothing to do; the manner and place of his service are clearly for the military services, not the Board. Hence these statements remain equivocal and can be resolved only by what he does when faced with the actual issue of going or not. Cf. Billings v. Truesdell, supra. And that brings us back to the testimony of Miss Mathews and defendant, only partially aided by the nuances of thought and belief shown by the other evidence. Therefore, this other evidence cannot be considered so overwhelming as to justify restrictions on defendant's evidence bearing on the very event in issue.

▮▮▮▮ This result seems to us also required by the course of the trial here. In a case of this kind involving racial difficulties, that feeling for impartial justice which we like to regard as typically American would undoubtedly be better satisfied if the public officials leaned even backwards in an endeavor to see that

the accused had an impartial trial. Yet the court was assiduous in securing a conviction, from the attorneys' opening statements, bringing reproof to defendant's counsel, through the unusual restrictions placed on cross-examination of the prosecution's witnesses, particularly Miss Mathews, and the exclusion of the proffered testimony for the defense (with a sharp warning to the father as a witness not to volunteer the evidence we now hold admissible), to finally the court's charge, where, as we have seen, defendant was characterized as having the "presumption" to state his conditions.[1] At no time was there the slightest doubt of the court's own attitude. Not unnaturally the jury was out only fifteen minutes, and then it received the thanks of the court "for its prompt deliberation and correct verdict." Moreover, the court declined to defer sentence for even a day or two, as requested by counsel, so that he might present anything that he "might be able to gather"; but, stating that "justice here must be speedy justice," it proceeded at once to impose the maximum sentence allowable, five years, or two and one-half times the maximum for that favorite charge of federal prosecutors against even hardened criminals, to wit, conspiracy. Ordinarily a sentence within legal limits is within the discretion of the trial court. Johnson v. United States, 8 Cir., 126 F.2d 242, 251. Yet in weighing whether error is prejudicial, we have allowed an unusually harsh sentence to turn the balance. United States v. Trypuc, supra; Amendola v. United States, 2 Cir., 17 F.2d 529, 530; Nash v. United States, 2 Cir., 54 F.2d 1006, 1008, certiorari denied 285 U.S. 556, 52 S.Ct. 457, 76 L.Ed. 945.

We think the ends of justice require a new trial. Reversed and remanded.

CHASE, Circuit Judge (dissenting).

When it is so clear as it is upon this record that the appellant never presented himself for induction but only for debate, the time he chose in the morning to do that and to state anew his conditions upon service seem to me utterly beside the point on this appeal. That being so, whether that choice of time was wholly his own or to some extent controlled by the conduct of his mother that morning was immaterial and so treated on the trial as I shall try to demonstrate. With all deference, I must say that the mandate of 28 U.S.C.A. § 391 has been ignored by making the flimsiest of technical errors, if errors they were at all, bear the burden of relieving a stubbornly guilty man, at least temporarily, of the consequences of his guilt; and of putting the government to much unwarranted trouble, delay and expense.

The appellant did testify in complete refutation of what were made the decisive facts proved on trial by the evidence against him and submitted as such to the jury. His real trouble is not trial error but his inability to make the jury believe his testimony. I quote what he testified he said to Miss Mathews who was the clerk in charge at the headquarters of the local draft board when he got there belatedly that morning in response to the notice to report. " * * * —I told her that I had put all my affairs in order with the priest and everything, and I had no more objections, as long as it would not be all right with the Army authorities, that I am willing to go in with the rest of the American boys without any objections whatsoever. So, the idea was then, she says to me, if I still thought the same way as I did previously as to going overseas to kill people, sir; and I told her, I says I still thought that way, but I would be willing to forget the whole thing, because there is just more than the private man's opinion involved now; it is the matter of safeguarding the country. And I said, 'I am willing to go without any objections.' Then she told me I should come back that night, sir, and consult with the F. B. I. She told me that evening the F. B. I. Agent would be at the Draft Board to consult with me on my problem previous to my induction into the Army.

"Q. Did you tell her that morning that you could not fight against the Axis Powers? A. No, sir, I did not.

"Q. Did she say anything to you about going over to the induction center that morning? A. She told me it would be no use for me to go to the induction center. She said I should wait before my induction, to talk to the F. B. I."

---

[1] The court also charged erroneously, though probably inadvertently, that defendant could have gone from the Board of Appeals "to the President of the United States." A registrant may appeal to the President on grounds of dependency only. 32 CFR, 1941 Supp., 628.2.

Miss Mathews denied on redirect examination that she ever mentioned the F. B. I. to the appellant and on her direct examination she had already testified as follows as to what occurred when the appellant appeared at the local draft board on the morning in question; that of November 24, 1942.

"Q. Did you have a talk with the defendant? A. Yes, sir, I did.

"Q. Can you recall exactly, or if you cannot recall the exact words, in substance what was the talk you had with the defendant? A. Well, I naturally asked him would he go down for induction, and he said, 'No.' I asked him why. He said he still was under the opinion that he has expressed to the Local Board in a previous hearing—that he would not fight against Germany, Italy and Japan. He figured that the United States has stabbed Italy and Japan in the back and he definitely refused to serve.

"Q. Miss Mathews, that is the conversation that took place at 10:30 a. m.? A. Yes, sir.

"Q. Did he tell you that he was ready for induction? A. No, sir, he did not.

"Q. You are certain of that? A. I am positive.

"Q. Did you advise the young man to come in later, in the evening, and have a talk with the local appeal agent? A. Yes, sir.

"Q. Were you present that evening when the defendant came to the Draft Board? A. Yes, sir, I was. * * *

"Q. Has he at any time since November 24, 1942, presented himself to the Draft Board for the purpose of being inducted into the United States Army? A. No, sir, he has not.

Immediately thereafter her cross examination began as follows:

"Q. Miss Mathews, on the morning that this young man came to the Draft Board for induction, had all the other boys gone over? A. Yes, sir, they had.

"Q. Well, is it customary, is it usual for some of the boys to go late and you send them over afterwards? A. They have been, but they have all been willing to serve.

"Q. I did not ask you that. I asked you solely is it a custom in your Board, if a boy is late, that you send him over to Grand Central, anyway, by himself? A. Yes, sir.

"Q. You had done that on previous occasions? A. Yes, sir.

"Q. You did not do that on this occasion, did you? A. I could not send a man if he refused."

Miss Mathews was corroborated to a large extent by the circumstances shown and by other witnesses and the appellant was correspondingly discredited. The decisive facts having been well proved beyond a reasonable doubt were clearly submitted to the jury as such in the judge's charge. In that charge appellant's tardiness in appearing that morning was given no emphasis. The charge began with a broad statement of the issue as follows: "I shall not deliver a long charge, because the issue of fact, the fundamental, critical issue of fact in the case, is very simple. The question is whether this defendant, having received a notice from the Local Draft Board acting pursuant to the Selective Training and Service Act, to report for induction * *' * unlawfully, willfully and knowingly failed and neglected to report for such induction at the time and place fixed in said notice."

The court then charged the jury as to the applicable law in its relation to the evidence and only once mentioned the undisputed fact that the appellant did not appear on time that morning. Then he did so only to point out that when "he did appear some time later" he testified that he did not refuse to be inducted and the chief clerk testified that he did refuse. There was not the slightest intimation that the time of day when he refused to serve or didn't so refuse was of any consequence. And to leave no doubt that the real issue of fact he was submitting to the jury was not one of promptness in reporting on the hour for induction but of refusing to report for that purpose at all, the very last words of the judge to them were— "The issue is therefore very simple. That is, in sum, the proof of the Government on the question of failure to report on the day in question for induction and his state of mind at the time when he did report at ten o'clock or thereabouts.

"On the other hand, he says that he did not refuse to be inducted. Well, it is for you to determine where the truth lies."

This, of course, was but a reflection of the real issue of fact which the record

otherwise shows had been made crystal clear to the jury.

And with that so plain, why it can be thought that the exclusion of appellant's trial excuses for being late could have made any difference in the verdict is simply beyond my comprehension. If the jury believed, as it certainly did and as the evidence abundantly proved, that this man refused to be inducted in accordance with the law, of course that refusal was deliberate—the result of much time for consideration—and was therefore willful. If it can be thought that his tardiness was additional evidence of his willful flouting of the law and of its administration that much at most merely brought more coals to Newcastle. To show that so much was excusable would have left the remainder as adequately black as before. It was to prevent reversals merely for technicalities not affecting any substantial right of a party that § 391 of Title 28 U.S.C.A. was enacted and that statute is but one sufficient reason why this judgment should be affirmed.