**UNITED STATES v. CORN.**

Cr. No. 417.

District Court, E. D. Wisconsin.

Feb. 14, 1944.

B. J. Husting, U. S. Atty., and E. J. Koelzer, Asst. U. S. Atty., both of Milwaukee, Wis., for plaintiff.

William Kershaw, of Milwaukee, Wis., for defendant.

DUFFY, District Judge.

A jury having been waived, the defendant was tried before the court on a charge of murder. The evidence disclosed that on October 3, 1942, Fred Shawano, Raymond King, and Elmer Moses Corn, the defendant herein, each young Menominee Indians ranging from 21 to 23 years of age, and one Kawkow Notinokey, an Indian aged about 54, drove to Phlox and Matoon, which are communities beyond the limits of the Menominee Indian Reservation, and purchased a gallon jug of wine; that on the return trip they traveled on Camp 26 Road within the Indian Reservation, and by the time they reached the intersection of Camp 26 Road and State Highway 47 which is likewise on the Reservation, they had consumed about half of the wine; that a rather heavy rain was then falling, and as the car approached the intersection it slipped off the Camp 26 Road and struck a signpost on the right or southeasterly side of that highway; that the three younger men had been riding in the front seat, and Notinokey in the rear seat; that as they got out of the car, Notinokey had the jug of wine and started to run in a westerly direction up Highway 47; that his three companions overtook him when he had traveled approximately 100 ft. from where the car was stalled; and that he was seized by the defendant, who swung him around and struck him on the jaw with his fist, followed by a blow from King which dropped Notinokey to one knee, and, as he stood erect, the defendant again hit him a powerful blow on the jaw with his fist, whereupon Notinokey sank to the highway unconscious. The evidence further disclosed that King then dragged Notinokey back to where the car was stalled, and they left him on the side of the road while the three young men consumed the balance of the wine; that at that time Notinokey was still breathing but continued in an unconscious state; that thereafter the defendant took hold of Notinokey's feet and King took hold of his head and they carried him westerly on Highway 47; that as they started carrying him, the defendant thought they would take Notinokey up the road and place him under some trees on the side of the hill where he would "sleep it off"; that when they reached the bridge over Little West Branch of the Wolf River, Fred Shawano said, "Throw him over," and the defendant and King complied with that sugges-

tion; and that defendant heard Notinokey's body strike the water and knew that the water at that point was of considerable depth. Shortly after passing under the bridge, the water in Little West Branch flows into what is known as the "Mill Pond". Defendant never made an effort to ascertain what became of Notinokey, and his body was discovered the following July, floating in the Mill Pond at a point about one-quarter mile from the bridge.

Practically all of the facts hereinbefore stated were proved on the trial as a result of oral statements made by the defendant to a representative of the F.B.I. in the Superintendent's Office on the Indian Reservation, a written statement made by the defendant to the same F.B.I. agent in the County Jail at Shawano, and statements made by the defendant under oath at the hearing before the U. S. Commissioner in Green Bay after he had waived immunity. In addition to establishing the corpus delicti, the evidence produced other than the statements of the defendant was merely to the effect that the auto had been stalled at the place hereinbefore stated, and that when it was pulled out of the ditch the defendant was in the car and appeared to be intoxicated; that at that time Shawano and King were present; and at least one witness testified that on October 4, 1942, the day after the last night Notinokey was seen alive, King stated that the defendant had a fight the night before with Notinokey, such statement being made in the presence of the defendant and not being denied by him. Therefore, if none of the three statements made by the defendant are admissible, the government would not have proved its case, and the motion of the defendant's counsel for a discharge of the defendant would have to prevail. Therefore, a careful analysis must be made of the circumstances under which the various statements of defendant were obtained.

In the latter part of October or early November, 1942, after Notinokey was reported missing, the defendant and his two companions on the night of October 3, 1942, were detained by the Indian Police at the Indian jail on the Reservation. Defendant claims that the confinement was for a period of three weeks, while the then Chief of the Indian Police testified that the period was not in excess of one week. In any event, defendant and his companions were released and were not again questioned during the winter or spring of 1943.

Notinokey's body had been recovered from the Mill Pond on July 18, and was identified by articles of clothing. On the morning of July 22, the F.B.I. agent sent to investigate the crime requested to interview Shawano and the defendant, and someone from the Office of the Indian Police was sent to bring them to the Superintendent's Office. They arrived about noon, and the F.B.I. agent subsequently questioned Shawano for about one and one-half hours in the presence of the Chief of the Indian Police and the Superintendent. At 2:30 P.M. the defendant was called in and questioned in a similar manner for a period between one and one-half and two hours. He was informed of his constitutional rights, and after some questioning he finally told the story as heretofore set forth. No threats were made and no inducements were offered. The defendant appeared relieved to get the story off his chest. He was taken to Shawano, but the U. S. Commissioner residing in that city could not be located. The F.B.I. agent was informed he was absent on a vacation. The agent then telephoned to Green Bay, 37 miles distant, trying to get in touch with the next nearest U. S. Commissioner. The defendant was placed in the Shawano County Jail where he was again advised that any statement he might make could be used against him and that he need not make any statement, but while in the jail he gave a statement in writing to the F.B.I. agent, who then went to Green Bay. The next morning the F.B.I. agent swore to a complaint, a warrant was issued, and he returned to Shawano and took the defendant into custody and proceeded to Green Bay. Their arrival at Green Bay was in the afternoon, too late to bring defendant before the commissioner, and he. was lodged that evening in the Brown County Jail. On the next morning, July 24, after again being advised that he did not need to make any statement and that any statement he might make could be used against him, the defendant signed a waiver of immunity, and then testified before the commissioner as to his activities on the night of October 3, 1942, telling the same story as previously given on the Reservation and at the Shawano Jail. The testimony before the commissioner was taken by a short-hand reporter and transcribed and appears as part of the record made before the commissioner. At the trial, over the objection of the defendant, the F.B.I. agent testified as to the statements made

by the defendant both in the Superintendent's Office on the Reservation as well as at the Shawano County Jail.

Defendant's counsel, after having moved to discharge the defendant for the reason that the evidence was not sufficient to sustain the indictment, which motion was denied, made a motion to exclude from evidence all of the statements of the defendant. For the purpose of said motion defendant's counsel stated that he wished to use the record made on the preliminary examination without prejudice. This request was granted. Counsel then formally moved to dismiss the proceedings for the reason that on the preliminary examination, defendant was not intelligently advised as to the waiver of immunity signed by him or that he was entitled to be represented by counsel. At request of counsel for defendant, certain parts of the record made at the preliminary examination were read into the record of this trial. The court ruled, "* * * I am going to deny the motion now. If you have any evidence to present we will take it up."

Thereafter the following colloquy occurred:

"Mr. Kershaw (Defendant's Counsel): If the court please, I introduce all of the testimony taken before the commissioner on this.

"Court: Mark it as defendant's Exhibit A.

"Mr. Koelzer (Assistant U. S. Attorney): You mean you offer the testimony given before the commissioner?

"Mr. Kershaw: Yes.

"Mr. Koelzer: In the matter of the United States v. Elmer Moses Corn?

"Mr. Kershaw: Yes.

"Mr. Koelzer: Not the Shawano or other matters?

"Mr. Kershaw: No.

"Mr. Koelzer: We have no objection to that being offered. We would also like to offer the waiver of immunity that is part of the same transcript.

"Court: It will be received.

"Mr. Koelzer: Which was read to the court.

"Mr. Kershaw: Offer of testimony and waiver taken at the hearing at Green Bay before Commissioner Kehoe.

"Court: It will be received."
This colloquy is set forth in detail because of the government's claim that even though the statements of defendant made at the Reservation and at the Shawano Jail are excluded, defendant repeated the same story in full at the Commissioner's hearing, and that it was the defendant's counsel who introduced that testimony into the record of this trial.

The decisions of the Supreme Court in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, and Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, came somewhat as a shock to many who were intimately concerned with, and experienced in, the administration of criminal law. The Circuit Court of Appeals for this circuit has expressed doubt that the newly promulgated rule of evidence would result in any improvement to the administration of criminal justice. United States v. Haupt, 7 Cir., 136 F.2d 661, 671. At least one court has construed these decisions as laying down a rule that confessions or statements made by a defendant while in custody and prior to arraignment may not be received in evidence on the trial. Mitchell v. United States, App.D.C., 138 F.2d 426. That court stated (page 427): "* * * That this new rule, as Mr. Justice Reed calls it in his dissent, introduces a far-reaching innovation in the established rules of evidence in criminal cases will hardly be questioned * * *."

However, I do not believe that the McNabb and Anderson decisions should be so broadly construed as to rule out all statements made by a defendant in custody before the time of the preliminary hearing. In trying to determine just what was decided in those cases, it is well to keep in mind that in the Anderson case, page 353 of 318 U.S., page 600 of 63 S.Ct., the court said: "* * * To determine whether these statements were properly admitted in evidence, it is necessary to particularize the circumstances under which each confession was made." In the McNabb case page 346 of 318 U.S., page 615 of 63 S.Ct., the court said: "* * * The mere fact that a confession was made while in the custody of the police does not render it inadmissible." The court then cites, among others, the cases of Ziang Sung Wan v. United States, 266 U.S. 1, 14, 45 S.Ct. 1, 69 L.Ed. 131, and United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 157, 44 S.Ct. 54, 68 L.Ed. 221. These cases support the rule that a confession otherwise shown to be voluntary isn't rendered inadmissible by the mere fact that the accused was under arrest or in custody at the

time it was made and that it was made in answer to an interrogation by a police officer.

The real basis for the McNabb decision, page 344 of 318 U.S., page 615 of 63 S.Ct., lies in the following language: "The circumstances in which the statements admitted in evidence against the petitioners were secured reveal a plain disregard of the duty enjoined by Congress upon federal law officers. * * *"

■ The courts should be and are properly concerned that no confessions be obtained by threats, brutality, or other third degree methods. Unceasing effort must be made to safeguard and protect the rights of the individual against the overzealous enthusiasm of law enforcement agents. Congress has shown its interest by requiring that the marshal or other arresting officer take the one accused before the nearest U. S. Commissioner or nearest judicial officer having jurisdiction for a hearing, commitment, or taking bail for trial. 18 U.S.C.A. § 595. Likewise the Act of June 18, 1934, 5 U.S.C.A. § 300a, authorizing officers of the F.B.I. to make arrests, requires that "the person arrested shall be immediately taken before a committing officer." The statutes were intended to and by their terms do prohibit undue delay between apprehending one charged with or suspected of crime and his being given a hearing, so that the magistrate himself may discharge the accused where no sufficient evidence other than a confession is produced and where there is indication or suspicion that the confession was wrongly obtained.

But in the case at bar, no undue delay occurred in bringing the defendant before a United States Commissioner. He was questioned and confessed his guilt on the afternoon of July 22, and would have been brought before a commissioner on the same day but for the absence from the city while on a vacation trip of the one living nearest the Reservation. The F.B.I. agent who questioned the defendant went to Green Bay, a distance of 37 miles, that same night and appeared before the nearest available commissioner the following morning and filed his complaint. Apparently all government officers believed the preliminary hearing would be held on that day, July 23, but by the time the F.B.I. agent traveled back to Shawano and returned to Green Bay with the defendant, it was late in the afternoon and the com-

missioner was not available. The hearing was held on the morning of the 24th. The evidence in this case is barren of even the slightest suggestion of any threats against or intimidation of defendant; nor is any claim made by the defendant that there was any violence or unlawful means used to obtain any of his three confessions. Quite the contrary appears. Once the body was found and the defendant was requested to come to the Superintendent's Office, and after some questioning, he seemed anxious to make a clean breast of the whole affair which probably had preyed on his mind for the 9-1/2 months since Notinokey's disappearance, and especially since he was aware it was known he had been in the company of and was reputed to have had a fight with Notinokey on the last night the victim was seen alive.

■ The investigating officers made no attempt to delay defendant's hearing before a commissioner. On the contrary an effort was made to bring him before the commissioner living at Shawano on the very afternoon that he made his first statement. When this was impossible, a prompt effort was made to arrange a hearing the following day before the next nearest commissioner at Green Bay. Surely the officer is innocent of any disregard of the duties enjoined by Congress.

I agree with the statement in the opinion of Judge Schwellenbach in United States v. Klee, D.C., 50 F.Supp. 679, 681: "* * * when one seeks to exclude a confession upon the basis of the rules of evidence, the basis of this effort is that a confession secured under certain circumstances is untrustworthy. * * *" Not a single circumstance under which this defendant gave his various statements makes them untrustworthy. Each was properly received in evidence.

■ Considering now the motion to dismiss the proceedings on the ground defendant was not competently and intelligently advised he was entitled to be represented by counsel at and before the preliminary hearing, and that he was not represented by counsel and did not competently and intelligently waive this constitutional right, an examination of the proceedings before the commissioner (offered in evidence by defendant's counsel) reveals that after reading the charge against the defendant to him, he was asked if he had talked with an attorney, to which he replied, "Not yet." He was asked if he had tried to ob--

tain the services of an attorney, and he replied negatively. Prior to any questioning as to the details of the crime, the commissioner was careful to again advise him as to his constitutional rights and that he did not have to make any statement if he did not so desire, in the following language:

"Q: Mr. Corn, it will not be incumbent on you to answer any further questions if you don't want to. You can stand on your constitutional rights. Anything you say can be used against you. However, if you desire to waive your constitutional rights and tell what happened you can do so. Understand?

"A: Yes.

"Q: I want to ask you a few questions and you can answer them if you want to. Do you know this Kawkow Notinokey?" Etc.

With respect to the waiver of immunity that had been signed earlier on that day, he was asked the following:

"Q: Mr. Corn, this is your signature and you signed it this morning? (Holds a waiver of immunity toward Mr. Corn and indicates his signature on it.)

"A: Yes, at the jail.

"Q: You understand what it means? It means that you are freely testifying here in this case against Fred Shawano, and that you are waiving any claim or right to immunity. That is, that by testifying it doesn't mean that you are going to be given any consideration or that any promises have been made to you. You understand that?

"A: Yes."

While this defendant had not gone further than the seventh grade in school, and had not had much experience outside the Reservation, he cannot be considered uneducated. He writes a fairly good hand, and apparently had a full understanding of the proceedings and the consequences of his statements and of signing the waiver. He had adequate opportunity to obtain the services of counsel if he had desired them. He had the right to and did waive his constitutional right to the assistance of counsel at the preliminary hearing. Therefore, all motions made in behalf of the defendant must be denied, and the defendant found guilty.

Was the offense of which the defendant is guilty murder in the second degree or manslaughter? The government conceded that murder in the first degree has not been proved.

The testimony is silent as to whether Notinokey was living or dead at the time the defendant and King started to carry him toward the bridge. While testimony was introduced showing that he breathed as he lay unconscious beside the road, it is indisputable that he lay there for a considerable period of time while defendant and his companions finished drinking the jug of wine. Notinokey might have been dead when they started to carry him along the road. But if he were in fact still living when thrown from the bridge, death was caused either by the force of the blow when his body struck the water or by drowning. The condition of his body when found prevented an autopsy. Giving the defendant the benefit of the doubt, I hold that he is guilty of voluntary manslaughter.