Carl Calvin **WESTOVER**, Appellant,

v.

**UNITED STATES of America**,
Appellee.

No. 19543.

United States Court of Appeals
Ninth Circuit.

March 11, 1965.

F. Conger Fawcett, San Francisco, Cal., for appellant.

Cecil F. Poole, U. S. Atty., Jerrold M. Ladar, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before CHAMBERS, Circuit Judge, MADDEN, Judge of the Court of Claims, and JERTBERG, Circuit Judge.

MADDEN, Judge:

This is an appeal from convictions on two counts of violations of 18 U.S.Code, §§ 2113(a) and 2113(d). Count (1) charged the robbery of a federally insured savings and loan association, and count (2), the robbery of a federally insured bank. Both of these financial institutions were in Sacramento, California. The savings and loan association was robbed on February 4, 1963, and the bank on March 14, 1963.

The appellant was arrested in Kansas City, Missouri, at about 9:45 p. m. on March 20, 1963, by two Kansas City policemen, on charges of robberies in Kansas City and also because of a report from the Kansas City office of the Federal Bureau of Investigation that the appellant was wanted on a felony warrant from the State of California. When arrested, he was entering an automobile. When he was first questioned by the Kansas City policemen he gave a false name, but later admitted his identity. He was searched, at the time of arrest, and his automobile was searched. He was taken to police headquarters and, after notice had been given to personnel in places in Kansas City that had been held up, he was placed in a line-up and identified by certain observers as the robber. At about 11:45 p. m. he was "booked" by the Kansas City police.

F.B.I. agents in Kansas City, having been advised that the appellant had been arrested by the Kansas City police and was in custody in the city jail, told the police that they desired to interview the appellant. At about 11:30 a. m. on March 21, the F.B.I. agents were told that the appellant was available, in a room in the city jail. He had been interrogated, during the forenoon, by the police with regard to the local robberies. Three F.B.I. agents conducted the F.B.I. interview. No Kansas City policeman was present at the interview. The F.B.I. agents advised the appellant that he did not have to make a statement; that any statement that he made could be used against him in a court of law; that he had the right to consult an attorney. The agents made no threats or promises to the appellant. The appellant made detailed statements as to how he had committed the two Sacra-

mento robberies for which he was later indicted and tried. His statements were written down in long-hand by one of the agents, as they were made, a separate statement being made for each of the robberies for convenience of filing. The statement about the savings and loan robbery occupied three pages and the one about the bank robbery occupied four pages. During the interview, there was on the table in the interview room a gun which the Kansas City police had found when they searched the appellant's hotel room. This search was made pursuant to a "waiver of search" given by the appellant to the Kansas City police. The appellant said to the F.B.I. agents that that was the gun which he had used in the robberies. He said that the money, approximately $600, which he had when he was arrested in Kansas City was a part of the proceeds of the bank robbery, that it was all that was left of the $4300 which he obtained in that robbery, because he had lost all but $1000 of the money gambling at Las Vegas on his way to Kansas City.

The statements were signed by the appellant and the F.B.I. interview was completed at 2:00 or 2:30 p. m., some two or two and one-half hours after it began. At the time the interview began, and when it ended, none of the F.B.I. agents had received from Sacramento any details regarding the robberies described in the appellant's statements to them. They had, so far as appears, only been notified that the appellant was "wanted" for the robberies.

Two of the same three F.B.I. agents interviewed the appellant again on the morning of the following day, i. e., on March 2. He told them that he wanted to change his statement of the previous day with regard to his mode of transportation to the savings and loan company on the day he robbed it, and to make a similar change with regard to his transportation in connection with the robbery of the bank. He said that the rest of the two statements were true as he had made them the previous day.

The statements above discussed were offered and received in evidence at the appellant's trial. He now urges that they should have been excluded, sua sponte by the court, even though appellant's counsel at the trial did not object to their admission. He says that the doctrines of the cases of McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819; Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100; Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479; and Ginoza v. United States, CA 9, 279 F.2d 616, and Rule 5(a) of the Federal Rules of Criminal Procedure require the exclusion of the appellant's confessions.

The precedents cited by the appellant have no direct application to the facts of this case, since the appellant had not been arrested by federal officers and was not in their custody at the time he made the statements, nor, as we shall see, until eleven days thereafter. The appellant, however, urges that, even if a prisoner is in state custody, the McNabb exclusionary rule may exclude a confession made to federal agents if there is between the state and federal agents a cooperative "working arrangement" of a kind which makes the federal agents responsible for illegal detention by the state agents.

Appellant cites Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829, as the instance in which the Supreme Court applied the doctrine referred to above. In that case a Tennessee sheriff illegally arrested many persons suspected by him of having blown up certain power lines. They were not taken before a magistrate, as Tennessee law required. They were held in custody in a private building belonging to the company some of whose facilities had been blown up. While there held, they were questioned intermittently over a period of five days, during which they saw neither friends, relatives, or counsel. At the end of, and as a result of the interrogations, incriminating statements were obtained from six persons. They were indicted for and convicted of the federal crime of conspiring to damage property owned by the Tennessee Valley Authority, a federal agency. Their in-

criminating statements referred to above were admitted in evidence at their trial. The Court, in describing the experiences of the petitioners, first described those of Simonds. He was arrested on Wednesday afternoon. He was questioned by an F.B.I. agent on Thursday morning, by three agents for two hours on Thursday afternoon, by two agents for two hours on Thursday night. On Saturday afternoon and evening he was questioned during three different periods. On Sunday afternoon he was questioned, and confessed. The experiences of the other petitioners, each recited by the Court, were comparable.

The Court speaks of the petitioners having been held, some for days, and subjected to long questioning in the hostile atmosphere of a small company-dominated mining town. The Court says:

> "There was a working arrangement between the federal officers and the sheriff of Polk County which made possible the abuses revealed by this record."

The Supreme Court did not, of course, condemn working arrangements between federal and state law enforcement officers. It condemned the kind of working arrangement revealed in Anderson, "which made possible the abuses" which there occurred.

In the instant record we find no such abuses, nor any abuses at all. When a state has custody of a prisoner, we see no reason whatever why it may not allow F.B.I. agents, in the state's police headquarters, to interview the prisoner. In our case, being interviewed, the appellant rather promptly confessed, since the whole interview, including the writing in long hand of some seven pages, was accomplished in two or two and one half hours. The appellant was in the custody of the State. He had been arrested and booked by the State on two serious charges, robbery. There was no possible reason why the F.B.I., which had no evidence against him until it received his confessions, should have demanded or become responsible for his custody. If it were relevant, it might be noticed that the Missouri Statute, Vernon's Annotated Missouri Statutes, § 544.170, provides that one arrested without a warrant shall be discharged from custody unless within twenty hours he is charged on oath and held by warrant to answer. The time of the appellant's interview by the F.B.I. was well within the 20 hour period set by the Missouri statute. The fact that the F.B.I. allowed the appellant, on the day following his confessions, to correct his statements in ways unrelated to his guilt and of no interest to the prosecution is of no importance.

The fact that the State of Missouri held custody of the appellant for some eleven days after his confession before surrendering him to the F.B.I., which by that time had an indictment and a warrant for his arrest, does not retroactively convert the rational proceeding which occurred on the day after the appellant's arrest into an abuse of the kind which disturbed the court in Anderson, supra. It was not for the F.B.I., nor is it for us, to assume, without evidence, that Missouri's detention of the appellant was unlawful.

The case of United States v. Coppola, CA 2, 281 F.2d 340, affirmed 365 U.S. 762, 81 S.Ct. 884, 6 L.Ed.2d 79, involved a situation comparable to ours, and it was held that the admissions made by the appellant in that case were properly received in evidence.

In the case of United States v. Tupper, W.D.Mo.W.D., 168 F.Supp. 907, the Court applied the doctrine of Anderson, supra. It found that the defendants made their statements to F.B.I. agents during a period of unlawful detention by Kansas City police. The detention was from October 11 to October 14, on which day the confessions were made. The court found that the federal agents had knowledge that the defendants were being unlawfully detained by the Missouri police, and that the federal agents took the statements in the presence of, and with the cooperation of, the police. There are other factors recited in the opinion which,

the Court thought, justified its being decided as Anderson was decided. Tupper is readily distinguishable from the instant case.

■ On April 1, 1963, the federal grand jury in California indicted the appellant for the two Sacramento robberies. He was thereupon turned over by the Missouri state authorities to the F.B.I., arrested on a federal warrant, and returned to California for trial. The evidence of his guilt was ample. There were the two statements which we have discussed above. When the appellant was arrested in Kansas City he was still in possession of some of the currency which had been taken in the bank robbery, of which currency, by clever forethought, the serial numbers had been recorded by the bank, so that in case of robbery it could be put into the robber's loot as "bait money." There were many witnesses who identified the appellant as the one who committed the robberies. The method, used in both robberies, of compelling a supervisory employee to pass along the row of tellers inside the tellers' enclosure while he, the robber, followed along outside the enclosure making sure that his orders were obeyed, put him under the close observation of the tellers while he was robbing the two institutions. At the bank, one customer, Mrs. Ousley, was aware that the bank was being robbed and said so, and was quietly told by the robber to shut up. The identification evidence was convincing.

■ The appellant complains that his counsel was not permitted to obtain from an F.B.I. agent who was a witness for the prosecution the statement made to him by the witness Ousley mentioned above who was a customer in the bank, describing the robber. For some reason the F.B.I. agent, Miller, in preparing the statement which was to be signed by Mrs. Ousley, included only her narration of the actions of the robber, and not her description of him. The signed statement was furnished to the defendant's counsel. On cross-examination, the F.B.I. agent disclosed that he had also taken notes of Mrs. Ousley's description of the robber, had later dictated the substance of the description, had signed it, and had it with him in court. The defendant's counsel asked to see the statement. The prosecution said it had no objection. But the court of its own motion shut off the inquiry "on several grounds, on the ground that it has no probative value, on the ground that it is not proper cross-examination." The court also said that the statement was not admissible because Mrs. Ousley had already testified and had been excused, and therefore the statement could not be used to cross-examine her.

A short time later the prosecution recalled the F.B.I. agent, with the court's permission, for direct examination. He asked the witness whether he had made notes of Mrs. Ousley's description of the robber in her statement to him. The answer was in the affirmative. The court then interposed and prevented the prosecution from getting the statement and giving it to the defense counsel. The prosecution was persistent but the court was adamant in its position.

Mrs. Ousley had testified and been cross-examined by defense counsel. In the cross-examination it had been brought out that the F.B.I. agent Miller had interviewed her at the bank shortly after the robbery, and had later brought photographs to her house which she had identified as photographs of the appellant. It would have been prudent for defense counsel to ask Mrs. Ousley if Miller had made notes of his interview. The answer would have been affirmative, and then, if he desired, defense counsel could have called for the notes and, again if he thought it useful, could have used the notes in cross-examining Mrs. Ousley further. But he did not do these things, Mrs. Ousley completed her testimony, and no right to recall her was reserved. Three other witnesses testified and then Miller was called by the prosecution. On cross-examination by defense counsel he was asked whether he had taken a written statement from Mrs. Ousley, he said that he had, and produced the statement.

Defense counsel examined it during the over-night recess and put it in evidence, without objection, on the following morning. At this time defense counsel brought out, from Miller, the fact that Mrs. Ousley's description of the robber was not included in her signed statement but had been written up separately from Miller's notes of the interview, and that Miller had a typed copy of that writing in court. That was the paper which defense counsel requested, the prosecution offered, but the court would not permit to be disclosed.

We think the court might better have at least discussed with counsel the practicability of getting Mrs. Ousley back into court, if defense counsel, on examining the paper, concluded that he wanted to use it to cross-examine her. It is possible that the statements in the paper, vouched for by Miller as having been told him by Mrs. Ousley, might have been admissible as prior statements made by her which were inconsistent with her testimony, and even though no foundation had been laid for such evidence when Mrs. Ousley was on the witness stand. The paper was not a writing of Mrs. Ousley, nor signed by her, and the rule of the Queen's Case, 2 Brod. & Bing. 284, 286, would not be applicable. See IV Wigmore on Ev., 3d Ed. § 1259.

We have no reason to believe that there was anything in the paper in question inconsistent with Mrs. Ousley's testimony. The prosecution's eagerness to get the paper into the hands of defense counsel in order to avoid possible error is some indication of that. Defense counsel did not ask that the paper be made a sealed rejected exhibit so that an appellate court could examine it. It would be pure speculation on our part for us to conclude that there was something in that paper so important that it would warrant the reversal of this judgment. Defense counsel could have avoided this difficulty by questioning Mrs. Ousley about her interviews with Miller, of which defense counsel was aware. In the circumstances, we find no merit in the claim of error.

The appellant complains that a certain topcoat was marked for identification, was shown by the prosecutor to witnesses of the bank robbery, who testified that the robber wore a topcoat which looked like that one, and was ultimately admitted in evidence as a government exhibit. The appellant says that the coat should not have been admitted, because it had been acquired in an illegal search.

When the appellant was arrested by the Kansas City police he was searched and his automobile was searched. The automobile was then towed to the police storage lot. On the following day a policeman and an F.B.I. agent, without a search warrant, again searched the automobile and found the topcoat which is here under discussion, in the trunk of the automobile. That search was a violation of the Constitution, Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777, and the topcoat should have been excluded, if its admission had been objected to.

As we have said, the topcoat had been, early in the trial, marked for identification and shown to witnesses. Ordinary prudence would have caused the appellant's trial counsel to inquire then as to how the coat had been obtained, and, having learned the facts in that regard, to have objected to its use. But there was no objection, then or when the coat was finally offered in evidence. We think the appellant is not, in the circumstances, entitled to raise the question for the first time in this appeal. When inadmissible evidence is offered by the prosecution in a criminal trial, we think the defendant may not sit silent and allow the trial to be sabotaged when the inadmissibility of the evidence is obvious or could be made so by a simple inquiry.

Further, with regard to the topcoat, it was a relatively unimportant piece of evidence in a trial in which the other evidence of guilt was overwhelming. If we were to regard the admission of the coat as error, it would be harmless error, under Rule 52(a) of the Federal Rules of Criminal Procedure. In the

case of People v. Parham, 60 Cal.2d 378, 33 Cal.Rptr. 497, 384 P.2d 1001, the Supreme Court of California, which had applied the exclusionary rule in People v. Cahan, 44 Cal.2d 434, 282 P.2d 905, 50 A.L.R.2d 513, six years before the rule was made compulsory by Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, applied the California "miscarriage of justice" rule in a case in which illegally obtained evidence was admitted but in which, in the circumstances, there was no reasonable probability that that evidence affected the verdict.

The appellant has raised other questions which we have considered. We have concluded that they are without merit.

The judgment is affirmed.