**UNITED STATES v. CLAYTON-KENNEDY.**
No. 16290.

District Court, D. Maryland.
Jan. 13, 1933.

Cornelius Mundy, Asst. U. S. Atty., of Baltimore, Md., and C. C. Owens, Sp. Atty., Treasury Department, of Washington, D. C.

David Ash, of Baltimore, Md., George W. Sutton, of Washington, D. C., and Simeon T. Flanagan, of New York City, for defendant.

CHESNUT, District Judge.

In this case the defendant was indicted, as a nonresident alien, on three counts of willful failure to file income tax return and pay income tax for the year 1928. Motions in arrest of judgment and for a new trial have been filed.

1. *As to the motion in arrest of judgment:* This is based on the alleged legal insufficiency of the indictment. The case was assigned for trial before Judge Coleman on October 5, 1932. The defendant was then represented by a New York lawyer as counsel. An oral demurrer to the indictment was presented, argued, and overruled by Judge Coleman. Leave was given to file written grounds for the demurrer. The trial of the case was then set for a day later in October. It was postponed to a later date for the convenience of defendant's counsel, and then, New York counsel having retired and Baltimore counsel having intervened, it was again postponed

at their request until October 24, 1932. When finally called for trial, the new counsel interposed a written demurrer assigning specific causes for the alleged insufficiency of the indictment. As one demurrer to the indictment had already been argued before and overruled by Judge Coleman, I declined to hear further argument at the time on the demurrer or to allow it to be filed as of October 24, 1932, as that would be tantamount to a second demurrer. The case proceeded to trial, and, after lasting four days, resulted in a verdict of guilty by the jury, on all three counts of the indictment. The motion in arrest of judgment calls for a review of the sufficiency of the indictment. It is attacked on the following grounds: (a) Lack of certainty and particularity; (b) failure to state a federal crime; (c) that the offense charged is barred by limitations; (d) that the venue is wrong.

After careful study of the indictment, and the applicable law, I reach the conclusion that it is legally sufficient. The indictment is based on U. S. C. title 26, § 2146, subsections (a) and (b), and also on sections 2217, 2218 and 2053 (b) (1), 26 USCA §§ 2146 (a, b), 2053 (b) (1). Section 2053 (b) (1) required the taxpayer, if he has no legal residence or principal place of business in the United States, to make the return to the collector at Baltimore, Md. Section 2217 provides that, in case of a nonresident alien, returns shall be made on or before June 15th succeeding the taxable year, and section 2218 provides that the tax shall be paid at the same time. Section 2146 (a) provides the penalty for willful failure to make a return; and (b) provides the penalty for willfully attempting in any manner to evade or defeat the tax. The offense under subsection (a) is a misdemeanor and that under (b) is a felony. The rate of the tax applicable to the defendant as an alien resident in a contiguous country is provided for in section 2211 (b). Section 964 (a) (3) provides that every individual having a gross income for the taxable year of $5,000 or over, regardless of his net income, must make a return. Section 954 (c) provides: "In the case of a nonresident alien individual, gross income means only the gross income from sources within the United States, determined under the provisions of section 958."

It follows from these statutory provisions that, if the defendant was (a) a nonresident alien; (b) had a gross income of $5,000 or over; (c) from sources within the United States, and (d) had no legal residence or principal place of business in the United

States, then he was obliged to make a return and pay the tax to the collector at Baltimore, Md.; (e) on or before June 15, 1929, for 1928 income.

■ The indictment (disregarding formal matters) alleges, in the first count, that the defendant (1) was a nonresident alien individual; (2) required under the laws of the United States to make a return to the collector at Baltimore on or before June 15, 1929; (3) and derived and received from sources within the United States of America during the calendar year 1928 a gross income of over $5,000, to wit, $51,418.75; and (4) that he willfully failed to make a return. In the second and third counts the same allegations in substance are made, with the exception that, instead of alleging willful failure to make the return, it is alleged that the tax due was $5,515.38, and that the defendant willfully and knowingly attempted to evade and defeat the payment of the tax by willfully failing to make a return and by not making any payment. The second and third counts charge substantially the same offense with immaterial differences.

In my opinion, the indictment is not fatally lacking in particularity. The offense charged is, of course, a statutory one, and the gist of it is that, being a nonresident alien, and having an income of over $5,000 derived and received from sources within the United States of America during the prior calendar year, the defendant willfully failed to make a return, etc. The defendant contends that it was necessary for the indictment to further specify the items constituting the net income so that it would appear on the face of the indictment affirmatively that, to the extent the income consisted of compensation for personal services, the latter were performed within the United States as provided in section 958 (a) (3). But I think this particularity was not required in the pleading, although of course it had to be established by the proof. The indictment charged the elements of the crime as expressed in the statute. This is generally sufficient. United States v. Gooding, 12 Wheat. 460, 6 L. Ed. 693; Summers v. United States (C. C. A. 4) 11 F.(2d) 583, certiorari denied 271 U. S. 681, 46 S. Ct. 632, 70 L. Ed. 1149. In United States v. Behrman, 258 U. S. 280, 288, 42 S. Ct. 303, 304, 66 L. Ed. 619, it was said: "It is enough to sustain an indictment that the offense be described with sufficient clearness to show a violation of law, and to enable the accused to know the nature and cause of the accusation and to plead the judgment, if one be ren-

dered, in bar of further prosecution for the same offense."

This indictment meets this test. Further particularity as to the items of income was not necessary to inform the defendant of the nature of the accusation; nor were they necessary to enable the defendant to plead the judgment in this case in bar of further prosecution for the same offense. If such particularity was needed at all, it was only for preparation for trial, and this could have been obtained by asking for a bill of particulars. Fisher v. United States (C. C. A. 4) 2 F.(2d) 843, certiorari denied 266 U. S. 629, 45 S. Ct. 128, 69 L. Ed. 476. The defendant had ample time to prepare for trial as the indictment was filed July 7, 1932, and the case not brought to trial until October 24, 1932. The testimony at the trial indicated no real surprise to the defendant with respect to the items of income to which the proof related, especially as they had been called to his attention during the course of several interviews with a representative of the Treasury Department some months before the indictment was found.

As to limitations, it is true that the applicable statutory period for the first count was three years after June 15, 1929, and the indictment was not found until a few days thereafter, to wit, July 7, 1932. However, the statute (U. S. C. title 18, § 585 [18 USCA § 585]) provides that: "Where a complaint shall be instituted before a commissioner of the United States within the period above limited, the time shall be extended until the discharge of the grand jury at its next session within the district."

The proof in this case showed that such a complaint had been filed with the United States commissioner at Baltimore prior to the expiration of the three-year period, and the indictment was found by the grand jury at the same term of court. There may be some uncertainty as to the precise meaning of the word "session" as used in this statute; that is, whether it applies to the then current session of the grand jury during the term, or to the session of the grand jury beginning at the next term. But, however that may be, it is clear that the proviso was complied with in this case. This appeared, however, from the proof and not the pleading. While there is undoubtedly some authority for the contention that such a proviso in a statute should be pleaded, nevertheless it is sufficient to say that the rule of the federal courts has been decided to the contrary both by the Supreme Court of the United States and by the Circuit Court of Appeals of this circuit, at least where the limitation of time for prosecution is not made by the statute an essential element of the offense. United States v. Cook, 17 Wall. 168, 21 L. Ed. 538; Evans v. United States, 11 F.(2d) 37 (C. C. A. 4). See, also, United States v. Brace (D. C.) 143 F. 703; Biddinger v. Police Commissioner, 245 U. S. 135, 38 S. Ct. 41, 62 L. Ed. 193. As to the second and third counts, the applicable period of limitations by this section as amended June 6, 1932, was made six years. See, also, U. S. C. title 18, § 556 (18 USCA § 556) which provides that: "No indictment found and presented by a grand jury in any district or other court of the United States shall be deemed insufficient, nor shall the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant."

Nor was the venue wrong. The statute required the return to be made and the tax to be paid to the collector at Baltimore. That the defendant was never within the Maryland district is immaterial, because the statute required the performance of the duty at Baltimore, and the failure to perform it here is the offense. It is an offense of omission rather than of commission. In such cases the proper venue for the case is where the duty must be performed. Rumely v. McCarthy, 250 U. S. 283, 289, 39 S. Ct. 483, 63 L. Ed. 983; United States v. Lombardo, 241 U. S. 73, 36 S. Ct. 508, 60 L. Ed. 897.

It follows that the motion in arrest of judgment must be overruled.

*The motion for a new trial* is made on many grounds, including alleged errors in admission and rejection of testimony, in instructions to the jury, and newly discovered evidence. Arguments on this were heard at length from three separate counsel for the defendant, and, on request, leave was given to file affidavits in support of newly discovered evidence. Several affidavits have been filed by defendant's counsel. I have carefully considered them, and have also reviewed much of the transcript of the testimony at the trial.

With regard to alleged errors in rulings on evidence, it is entirely possible, in view of the very large number of objections and exceptions taken by defendant's counsel during the three-day period of testimony, that there may have been some technically erroneous ruling. But I am not convinced that even this was so, and, in any event, I do not think that there was any prejudicial error in the

trial. U. S. C. title 28, § 391 (28 USCA § 391) provides that: "On the hearing of any * * * motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties."

A definite effort was made throughout the trial and in the charge to the jury to emphasize for consideration of the jury at all times what was the real point at issue, that is, that the case dealt with income taxes, and other matters were immaterial.

With regard to alleged errors in the charge to the jury, I have reviewed the charge and the exceptions made thereto which have been stenographically reported and which were ruled upon at the trial. I do not think it necessary to further discuss that phase of the case.

With regard to the affidavits recently filed, I have examined these carefully and find they may be classified as relating to three separate subjects: (a) the alleged good faith of the defendant in failing to make the return and pay the tax, based on legal advice of Canadian counsel that he was not required by the American law to do so; (b) that the defendant resided and was occupied almost continuously in Canada during the first six months of 1928, and therefore the receipt of salary as president of the American Hydro-Carbon Company, in the amount of $34,375 during that year, was not taxable to the defendant as income from sources within the United States of America; (c) that some of the government's witnesses in this case were hostile and biased against the defendant, and that their testimony was inconsistent with prior testimony given by them in Canadian litigation affecting the defendant.

An understanding of the supposed relevancy and effect of these affidavits can be given only after some reference to the testimony in this case.

At the trial, the contention of the government was that the defendant had received taxable income during 1928 in the gross amount of $51,418.75, and that this was made up of two items: (1) Salary from the American Hydro-Carbon Company, $34,375, and (2) $17,043.75 profits from the sale of stock. The verdict of the jury being a general one, it does not appear with certainty whether the jury found both of these items, or the whole of either, taxable. The jury could not have properly found its verdict, however, unless it did find that more than $5,000 of gross income had been received by the defendant from sources within the United States and that there was some tax due thereon. The verdict of the jury could have been based properly on finding taxable income consisting of either salary or profits from stock sales. The affidavits do not relate at all to the matter of stock sales; but, as the greater emphasis at the trial was placed on the item of salary, it is probable that this was a material consideration to the jury, and therefore the affidavits may be discussed as dealing with a possibly essential element of the government's proof.

The most important testimony at the trial with regard to the salary item was as follows: For two years prior to 1928, the defendant has been president of the American Hydro-Carbon Company, a Delaware corporation with its offices in New York. Its principal activity was to exploit a process of producing oil from shale. It was interested largely as owner of stock of, and as fiscal agent for, a Canadian corporation known as the Maritime Eduction Company, and during the first half of 1928 a plant at or near Moncton, New Brunswick, was being constructed by this Maritime Eduction Company. The two companies were importantly related to each other, and the defendant, as president of the American Hydro-Carbon Company, gave a considerable amount of his time to the supervision of the erection of this plant. His compensation from the American Hydro-Carbon Company prior to May, 1928, was only in the form of stock for services. Shortly prior to May 9, 1932, the American Hydro-Carbon Company needed to raise further funds from stock sales, and a Mr. Ruxton, a New York capitalist, offered to make a further larger subscription to the stock of the company on the condition that he could be assured the needs of the company for three months' operation could be provided. Thereupon Mr. Kennedy prepared a budget for the period which included an item of salary for himself in the amount of $34,375, and, while there was no resolution of the board of directors authorizing the payment of this salary, it was verbally authorized by the executive committee of the board. Mr. Ruxton made large additional subscriptions to the stock, and on May 9, 1928, funds of the company were available in the amount of at least $25,000, and on that date a check for that amount signed by the defendant and another officer was placed to the personal credit of the defendant by deposit in New York and transmitted to Montreal and by him used for his personal benefit. The defendant claimed

that the executive committee had authorized payment to him of a cash salary at the rate of $75,000 a year for three years in the future. About July 16, 1928, the defendant was summarily removed as president of the American Hydro-Carbon Company. Shortly thereafter the defendant instituted a suit in a court of New York City against the company for his salary, claiming improper removal and crediting the receipt of the amount of $34,375 on account of the claim; and, on the subsequent bankruptcy of the company, he filed claim for the balance due him for three years at $75,000 a year, less the credit referred to. These claims were made under affidavit by the defendant.

The contention of the defendant and his testimony at the trial in this case was that he had not received a salary from the American Hydro-Carbon Company, but that the payment had been really made to him by the Maritime Eduction Company and was for services in supervising the construction of its plant at Moncton. In view of the documentary evidence establishing the direct application of moneys of the American Hydro-Carbon Company to the defendant, and its personal use by him, it was not made clear at the trial how, as the defendant claimed, the amount in question had been in fact paid by the Maritime Eduction Company, but the contention seems to have been based in part on the idea that the American Hydro-Carbon Company merely advanced the money for account of the Maritime Eduction Company. The issue of fact was submitted to the jury, and apparently found by them adversely to the defendant. There was considerable testimony at the trial on the issue of fact as to what portion of defendant's time during the first six months of 1928 was spent in New York and in New Brunswick respectively. This issue of fact was also left to the jury as bearing on the defendant's contention above stated. It was also found adversely to the defendant by the jury's verdict.

With this outline of the important trial testimony as bearing on the taxability of the defendant's salary, we come now to the relevancy and effect of the affidavits recently filed. With respect to additional evidence bearing on the defendant's good faith in failing to make the return and pay the tax, it is sufficient to say that this issue was also squarely raised during the trial and submitted to the jury under proper instructions. One of the affidavits on this subject is that of the Canadian lawyer who testified at the trial that he had advised the defendant that he was not taxable in America as a nonresident alien

because in his opinion the defendant was a "transient alien." The advice was, I think, mistaken [see Ingram v. Bowers (D. C. S. D. N. Y.) 47 F.(2d) 925, affirmed (C. C. A.) 57 F.(2d) 65; Bowring v. Bowers, 24 F.(2d) 918 (C. C. A. 2)]; but nevertheless the advice as bearing on the issue of the willfulness of the defendant's omission was submitted to the jury. The defendant's contention as to his good faith in failing to make the return for salary as *American* income would have been more impressive if it had been accompanied by proof that he had reported or accounted for the salary as *Canadian* income. It is understood that Canada has an income tax law in its fundamental features similar to our law. Attention of defendant's counsel was called to this by the court during the trial, and an opportunity was afforded to the defendant, if desired, to show that he had accounted for the item of income as Canadian income rather than American income; but counsel for the defendant took the position that this was entirely immaterial to any issue in the case, and declined to submit any testimony along that line.

As to those affidavits which relate to defendant's residence during the first six months of 1928 in Canada and his activities there during that period, it is sufficient to say that the subject is certainly not newly discovered evidence in any proper aspect of the matter. The issue was squarely raised at the trial, and there was much testimony on the part of the government to show that the defendant spent a considerable portion, if not most, of his time, in New York City during the period; and some to the contrary by the defendant. The new testimony now said to be available on behalf of the defendant would at the most be only cumulative. But, apart from that, it is difficult to see how, in view of the documentary evidence, and other facts referred to in the affidavits to be hereafter mentioned, the matter could be of substantial benefit to the defendant on the issue as to whether a salary received from American Hydro-Carbon Company was for services performed in the United States. It is not contended that the action of the executive committee in voting the defendant his salary allocated the compensation exclusively or even importantly to his Canadian activities. At best, the compensation was awarded to him generally for his services as president of the American Hydro-Carbon Company, which included important work in New York in general supervision of the company's finances and affairs, as well as supervision of the building of the plant in Canada, for which

he was to receive additional compensation to a large amount from the Maritime Eduction Company. Certainly the jury could have properly found from the evidence that a very material part of the defendant's services as president of the American Hydro-Carbon Company were performed in New York; and, in the absence of any evidence tending to show that any part of the salary was allocated to services performed outside of the United States, it would have been reasonable to infer that it was paid for his general services as president of the company and that the portion of his time spent in Canada to supervise the plant was only incidental to and part of his whole services as president. If the defendant had desired to apportion his salary between services in Canada and the United States, he should have furnished the proper data therefor in a return to the collector.

There remains to be considered those affidavits which purport to show bias and incorrect testimony from certain government witnesses. Some of this is put forward as newly discovered evidence. It consists principally of a contrast of some of the testimony of some of the witnesses in this case for the government with that given by them in certain Canadian litigation which followed the removal of the defendant as president of the American Hydro-Carbon Company. This issue is not entirely new, because it was referred to, although not fully developed, at the trial. Some of it was indeed offered by the government, but objected to by the defendant, and the objection sustained. In addition to certain excerpts from Canadian testimony referred to in the affidavits, the United States attorney has also now in answer referred to other parts of the testimony and proceedings in this Canadian litigation which may be briefly summarized as follows:

After the removal of the defendant as president of the American Hydro-Carbon Company, its other officers made some investigation of his administration of its financial affairs, and thereafter, early in 1929, instituted a criminal proceeding in Canada against the defendant, charging, in substance, embezzlement of the $25,000 above mentioned. In this proceeding the officers of the American Hydro-Carbon Company took the position that the defendant was not entitled to the particular fund as salary, but had received it for purposes of construction of the plant of the Maritime Eduction Company in Canada. The Maritime Eduction Company was also placed in bankruptcy in Canada, and the defendant asserted a claim for over $100,000 against its assets for compensation for services rendered to it in the construction of the plant. Certain testimony both of the defendant and of certain government witnesses in this case is referred to in the affidavits and by the United States attorney. It is claimed that the testimony of these government witnesses, who were officers of the American Company, is inconsistent with their testimony in this case. I have examined the excerpts from their testimony and compared them with the testimony given in this case. I do not find any material inconsistencies in the testimony itself. It is true, however, that the attitude of the American Hydro-Carbon Company with respect to the defendant's receipt and personal appropriation of $25,000 is inconsistent with the government's contention in this case that the money was received as salary. But the importance of the matter is not what was the contention of the American Hydro-Carbon Company in the Canadian litigation, but what is the truth of the fact as to whether the payment to the defendant was for salary or not. It can hardly be disputed that the defendant received the money and used it. Therefore the defendant's attitude toward the matter is more important than that of the American Company. Now the position taken by the defendant in the Canadian litigation with respect to the money was, in the criminal proceeding against him, that it had been paid to him as salary by the American Hydro-Carbon Company, and therefore was received and used by him rightfully and properly; and in the Maritime Eduction Company case his testimony, as stenographically reported in one place, was that the payment had not been made to him by the Maritime Eduction Company but by the American Hydro-Carbon Company; although the defendant's testimony in this case was that the transcript was a mistake and had been corrected. The final outcome of the plaintiff's claim against the Maritime Eduction Company was to establish the claim for the amount of $126,000, principally for services in the erection of the plant. In the criminal proceedings the trial court in Montreal, on April 9, 1929, convicted the defendant, but, on appeal to the court of king's bench, the conviction was reversed on the ground that the defendant in appropriating the said sum of $25,000 acted in the bona fide belief, based on the fact that the budget had been approved, that he was entitled to use the money, and that therefore he had at least the color of right to appropriate the said sum to his own use. This decision was rendered October 29, 1929.

It therefore now appears that the verdict

of the jury in this case is consistent with the finding of the Canadian court of king's bench; with the defendant's own attitude and contention in Canadian litigation; and with his affidavits in the New York litigation; all of which are inconsistent with his contention in this case that the salary was paid to him by the Maritime Eduction Company, and not by the American Hydro-Carbon Company. On this point, therefore, it would seem very clear that the new testimony relating to this Canadian litigation now offered would tend strongly to confirm the conclusion reached in this case, and it is difficult to see how the defendant, if a new trial was granted, could obtain any benefit from an introduction into the evidence of the Canadian litigation; nor is it in any proper sense newly discovered evidence because the defendant was necessarily thoroughly familiar with this Canadian litigation long before the trial of this case.

For these reasons, I reach the conclusion that the motion for a new trial must be overruled.

■ Coming now to the imposition of sentence, there are some special considerations in connection with the case that I think must properly be borne in mind.

This case deals with the application of the fiscal policy and laws of the United States to a nonresident alien in relation to sources of income accruing to him within the United States. It is said to be the first case of its kind that has been litigated on the criminal side. It may possibly be an interesting question as to the extent of the power of Congress to make effective statutes imposing criminal penalties on a nonresident alien never within the United States. But that question does not arise in this case, as the verdict of the jury was based on testimony from which the jury could have found that the defendant, although properly classed as a nonresident alien individual at the time for making the return and for some time prior thereto, nevertheless had been for a considerable period of time a resident in the United States, and the taxable income received by him arose from sources within the United States while here. U. S. C. title 26, § 958 (26 USCA § 958), defines what income of a nonresident alien shall be considered as income from sources within and without the United States with allowance for deductions and allocation of items. In this case the taxable income from sales of stock related to stocks acquired and sold by the defendant within the United States, and the issue in the case as to the taxability of the salary item

was dependent upon testimony with respect to whether the salary was for personal services performed in the United States, as required by subsection (a) (3) of section 958.

I also consider that the defendant is a citizen and resident of another and friendly government. And, while the principle cannot be admitted that aliens, citizens of friendly countries, are not amenable to our income tax laws to the extent that they properly apply, nevertheless it is, I think, a wise policy in enforcing these laws, especially on the criminal side, to do so with firmness, of course, but without needless severity.

Then again, while I think the verdict of the jury was entirely justified, it is fair to consider in favor of the defendant that the crime as charged does not necessarily involve a deliberate fraud by the defendant. This distinction has been recently pointed out by the Supreme Court of the United States in United States v. Scharton, 285 U. S. 518, 52 S. Ct. 416, 76 L. Ed. 917; and the evidence in this case, although it warranted a finding of tax evasion, did not show any positive fraudulent act, such as a knowingly false return.

Furthermore, the pendency of the Canadian litigation at the time when the return was due in this case and the uncertainty of its final outcome, on appeal, may have tended at the immediate time the return was due to have somewhat obscured the defendant's view of his proper duties (although even then the making of the return would have been consistent with his own position), and certainly after the decision on appeal in his favor there was no longer any sufficient reason for his not making a return and paying the tax. This he failed to do either then or thereafter, although months before the indictment in this case was found his attention must have been very directly called to his duties in the matter in his interviews with the representative of the Treasury Department. There was evidence in the case both from this official and from the defendant's own testimony from which it would be possible to find that his attitude toward the payment of the tax was decidedly evasive. I therefore necessarily reach the conclusion that the verdict of the jury, finding that his conduct in the matter was willful, was justified, and should not be disturbed, but nevertheless do find some reason for mitigation of sentence growing out of the circumstances above mentioned.

I also find that the second and third counts charge one and the same offense, and that the first and second counts, while charging tech-

nically separate crimes, in substance in this case deal with the one substantial charge of willfully failing to make return for and evading payment of income tax in the maximum amount of about $5,000.

Considering all the facts and circumstances of the case, I think the proper sentence is a fine of $7,500.