STATE, Plaintiff-Appellee, v. COLLETT, Defendant-Appellant.

Ohio Appeals, Second District, Fayette County.

No. 256.   Decided December 2, 1944.

228

Smith & Kirk, Wilmington, for defendant-appellant.
John B. Hill, Pros. Atty., Washington C. H., for plaintiff-appellee.

GUERNSEY, J., of the Third Appellate District sitting by designation in place of Barnes, P. J.

## OPINION

By HORNBECK, J.

This is an appeal from a judgment and sentence of defendant upon a verdict of guilty of murder in the first degree, without recommendation of mercy, of the killing of Elmer McCoy, Mildred McCoy and Forrest McCoy.

Ten errors are assigned which may be encompassed in four headings:

1. Error in the refusal of the court to require the State to provide the defendant with a bill of particulars upon his motion therefor and to grant a postponement of the trial.

2. Error in the refusal of the court to require the State to permit defendant to examine a copy of what is termed the report of the Coroner of Fayette County.

3. Error in the admission of the confession of defendant.

4. That the verdict is manifestly against the weight of the evidence.

## THE BILL OF PARTICULARS

Defendant moved the court to require the Prosecuting Attorney to particularize the "offenses attempted to be charged in the indictment" by particularizing as to all three counts as follows:

A. By stating the time of day on the 24th day of November, 1943, the said Elmer McCoy is alleged to have been killed.

B. By stating the particular location in Fayette County, Ohio, at which the said Elmer McCoy is alleged to have been killed.

C. By stating the instrumentality by which or the instrument with which, the said Elmer McCoy is alleged to have been killed.

D. By stating, if a firearm was the instrument used, the kind of firearm and the caliber thereof.

The trial judge carefully considered the question and handed down a written opinion in which he refused to grant the motion. He held, as is contended by counsel for the state, that the counts of the indictment stated the offenses intended to be charged against the defendant, citing §13437-13 GC which provides that:

"In an indictment for murder in the first or second degree or manslaughter, the manner in which or the means by which the death was caused need not be set forth."

He directed attention to the fact that the exact time of the commission of the acts alleged is not an essential averment and that the indictment, pursuant to §13437-4 GC, is in words sufficient to give the accused notice of the offense with which he is charged. These propositions are pertinent and germane had the defendant demurred to the indictment, the effect of which would have been to test if it stated charges of murder in the first or any degree. There is and can be no doubt that the indictment is good against demurrer because it is couched in the language of §13437-6 GC which provides the requisite forms for charging the offenses therein set forth, among which is murder in the first degree. However, it is the proviso at the end of this section, §13437-6 GC, with which we are especially concerned, namely, that the "prosecuting attorney, if seasonably requested by the defendant, or upon order of

the court, shall furnish a bill of particulars setting up specifically the nature of the offense charged."

The fact that the proviso follows the general terms of the statute and is made a part thereof is convincing that it requires something other, further and more specific than is set forth in the forms which are prescribed for the crimes therein enumerated.

There has been a marked change in Ohio in the necessary language required to charge a criminal offense. The prolixity of language with which indictments for murder were framed in earlier times has been completely abrogated by statutory developments, the last of which is carried into §13437-6 GC. By statute, it is now sufficient if it can be understood from the language of the charge that the offense was committed at some time prior to the date of the return of the indictment, §13437-2 GC.

In Ohio there is a dearth of decision as to the meaning of a bill of particulars as the term is used in §13437-6 GC. Its concept is well recognized in civil procedure and, no doubt, it is used in the criminal code with substantially the same meaning. That it contemplates something over and beyond the mere essentials of the averments necessary to state an offense is, in our judgment, ascertainable from the statute itself, which requires that the bill set up specifically the nature of the offense charged, and from the adjudications that we have upon the subject. (Emphasis ours).

In **State v Boyatt, 114 Oh St 397,** decided March 30, 1926, Judge Allen, speaking for the court, held that there was no provision in the law of Ohio, constitutional or statutory, for a bill of particulars in criminal prosecutions and that if an indictment does not describe the offense charged, it is subject to a motion to quash; that if an indictment states an offense that is all a defendant can legitimately ask, to be apprized of the nature of the crime sought to be charged. It is significant that §13437-6 GC effective July 21, 1929, after shortening the language essential to state the offenses therein named, especially provided that in addition thereto, a bill of particulars should be provided, if seasonably requested.

In **State v Whitmore, 125 Oh St 381,** decided subsequent to the enactment of §13437-6 GC, the court had the section under consideration and held that the defendant had waived his right to claim any of the benefits of a bill of particulars by failing to take advantage thereof seasonably. It is obvious from the opinion of Judge Stephenson, that the bill of particulars provision is purely procedural and affects not at

all the question of the sufficiency of the indictment. Judge Stephenson, at page 387 of the opinion, recognizes the right of the accused to have a bill of particulars and states that when given—

"The indictment and the bill of particulars constitute the charge against the accused,"

and that, even after a bill of particulars has been provided, if

"the charge remains vague, indefinite or uncertain or fails to state facts sufficient to constitute an offense under the laws of the state, then the acused has a right to resort, in the order provided by statute, to the motion to quash, plea in abatement, and demurrer."

He further says at page 388:

"The accused has the right to be reasonably informed as to the nature of the offense charged against him, so that he may be able to make an intelligent defense."

The same general holding is found in **State v Foster, 56 Oh Ap 267, 268, and in Jewett v State, 22 Abs 37,** an opinion by this court.

In the well known case of **State v Hahn, 59 Oh Ap 178,** the indictment was particularized by a bill which set up the type of poison, namely arsenic, by which death was caused.

In **State of Ohio v Lee, 20 O O 319,** a bill was demanded and furnished where the indictment charged murder in the first degree. In so far as we are able to learn, there was no question in any of these cases as to the sufficiency of the indictment to charge an offense and the bill of particulars was allowed to further inform the defendants of the facts upon which the State would rely to establish the charges against the defendants.

Twenty or more defendants in Franklin County Common Pleas Court, **State v Gossler** et al., **40 Abs 587, 40 Abs 601, 42 Abs 138,** were indicted for presenting to a public official a claim, bill * * * for allowance or payment, which bill was fraudulent and known to be such and receiving payment on such claim or bill, so presented, with such knowledge.

The defendants moved the Court for an order to require

the Prosecuting Attorney to furnish particulars setting up the operative facts upon which the State relied to show the nature and extent of each individual's participation in the overt acts of presentment and receipt of payment, etc. Without Court order, the Prosecuting Attorney provided Bills of Particulars to which the individual defendants excepted and each renewed his original motion, and requested further particulars in conformity thereto.

The Court, upon consideration of the motions, required the Supplemental Bill of Particulars, setting up the operative facts upon which the State of Ohio relied to show the defendant's, (naming him) individual connection with or participation in the alleged unlawful act charged in the count of the indictment; the specific means and manner by which said defendant dominated and controlled The Ohio Fuel Gas Company in relation to that company's acts as alleged in each count of the indictment; and to show how, and in what manner, the defendant procured the Ohio Fuel Gas Company to do the thing alleged in each count of said indictment to have been done by the said company. The State provided these Bills of Particulars in detail and it was assumed by the trial judge in considering the motions to quash and by this court in reviewing the order of the trial judge on the motions to quash, that the charges against the defendants included not only the indictments, but the Bills of Particulars filed pursuant to the court order. The trial court and counsel for the defendants were of the opinion that State v Whitmore, supra, by implication held that a Bill of Particulars, to be provided upon seasonable request, should set forth the ultimate facts upon which the State relied to establish the guilt of the defendants, and, as a matter of fact, the State detailed its evidence at length.

The general office and purpose of a bill of particulars in a criminal case is considered in states outside of Ohio in 27 Am. Jur. 671. It is said:

"as a general rule where an indictment is substantially good but does not so exactly allege the nature and extent of the crime of which the defendant is accused as to enable him properly to prepare his defense without a bill of particulars, the court will order the prosecuting attorney to furnish such a bill." Citing Kirby v U. S., 174 U. S. 47, Dunlop v U. S., 165 U. S. 486, and other authorities.

and in 27 Am. Jur. 672:

"The office of a bill of particulars is to supply the accused and the court additional information concerning an accusation that the defendant has committed an act or acts constituting a criminal offense."

It is designed to be used only where the indictment is sufficient on demurrer, Clary v Commonwealth (Ky.) 173 S. W. 171, and at page 673, 27 Am. Jur.:

"A defendant is entitled to a bill of particulars where the indictment or information although sufficient in law to charge an offense, is so wanting in particularity or information or is so extremely general in the language of the charge that the defendant is not given a fair and reasonable opportunity to prepare for his defense or trial."

State v Lewis (W. Va.) 72 S. E. 475;
Hurd v Commonwealth (Va.) 165 S. E. 536;
People v Florence, 262 N. Y. S. 775;
People v Carillo, 225 N. Y. S. 444;
Williams v U. S. (Tenn.) 3 F. (2d) 933;
U. S. v Gouled, 253 Fed. 239;
Ellis v State (Fla.) 76 So. 698;
U. S. v Clayton Kennedy, 2 F. Supp. 233.

It is our judgment that the defendant was entitled to a bill of particulars which would set out the ultimate facts, although not the evidence to support them, upon which the state expected to rely in establishing its case against him, and having supplied such a bill that it would be restricted in its proof to the indictment and the particulars as in the bill set forth.

In this case the language of the indictment for murder in the first degree was general in its terms. It was not specific as to time, place, means or manner of the commission of the offense although it clearly was sufficient to charge the offense under the statute.

The defendant by notice duly given stated his intention to assert the defense of alibi. Upon this defense which would require proof of his whereabouts throughout any period during which the murders may have been committed, it was vital to him that he know, within reasonable limits the time during which the offenses were claimed to have been committed.

The failure to sustain the motion of the defendant to require the state to provide him with a bill of particulars was erroneous.

Was this action prejudicial to the defendant? **State v Barlow, 70 Oh St 378.** 27 Am. Jur. 674 states:

"A bill of particulars is not necessary where the indictment informs the defendant of the crime with which he is charged sufficiently to enable him to prepare his defense, or where * * * the facts are already known to him, or where he has been fully informed as to the matters in question."

Defendant's counsel made request sometime before trial upon the State for an inspection of the confession and a copy thereof was given to him. Therein was set out the time when he arrived at the McCoy home, the place of the shooting, and the other facts incidental to the killing of Elmer McCoy. It thus is evident that the defendant had in his possession the claim of the State as to the time when and the place where the offenses were committed as fully as it would have been required to set it forth in a bill of particulars. The confession in this case provided the evidence without which the defendant could not have been convicted. It cannot reasonably be urged that the defendant did not know that the State was claiming that the McCoys came to their deaths by reason of being shot. It does not appear, from any proper source, that he knew the caliber of but one of the guns with which it was claimed the shooting was done but this clearly becomes inconsequential because his defense is that he at no time owned any revolver which would shoot.

Although the bill of particulars should have been provided the defendant upon his motion, it clearly appears that he was not prejudiced by the denial.

## CORORNER'S REPORT

The second error assigned under heading (1) is not of sufficient consequence to require any extended consideration. The Coroner of Fayette County held no inquest respecting the deaths of the McCoys; he was absent from the city. Nor does it appear that he had any official connection with the autopsies which were conducted by Dr. Charles Davis who was employed by the Prosecuting Attorney. Inasmuch as there was no coroner's report, it could not have been erroneous to deny the request of the defendant that the doctor privately employed by the State should turn over his report to the defendant.

## THE CONFESSIONS

Assignment of error No. 3:

**First:** That the confession was not in fact voluntary.

**Second:** If construed to be voluntary, since it was induced under circumstances which showed that the officers themselves were violating the law it should not be received in evidence.

**Third:** That the alleged confession being induced by a "lie-detector" or rather by the officer's interpretation and statement to his prisoner of what the "lie-detector" indicated, is itself as incompetent as its inducement would be.

The specific statement to which the third sub-heading is directed is found at Page 345 of the record where George Ekerman, Toledo City Detective, stated: "He told him (Collett) the test indicated something wrong with his statements." There was no objection to the question and no motion to strike the answer.

In this connection we consider the oral confessions as well as the written confession.

The oral confessions at Toledo were considerably more extended than the written confession. The principal part of the written, signed confession is as follows:

"I left home at about 7:00 P. M. and drove to Harveysburg, Ohio, and from there drove to Elmer McCoy's home thinking I could make some arrangements about my wife's share of her mother's rent money. I arrived at the McCoy home at about 8:30 P. M. and drove in the barnyard and parked near the house at the same time Elmer McCoy drove into the barnyard and parked near the barn. Elmer and I saw each other and walked in the barn discussing my wife's share of her mother's rent money, thinking we could all get together the next day and make some arrangements for a settlement. Elmer became very angry and picked up a club or fork handle and swung at me but missed me and at the same time reached for his gun. I then grabbed up a gun from the nail tie and shot him in the back. He fell between the feed grinder and the weather board inside the barn. The next thing I knew I was on my way home."

To fully appreciate the questions raised by the first and second branch of assignment No. 3 relating to the alleged confessions and to give aplication to the authorities cited, especially one federal case, it will be necessary to set

forth certain factual developments, some undisputed, some in direct conflict.

On Thanksgiving morning, Nov. 25, 1943, the dead bodies of Elmer McCoy, his wife, Forrest McCoy, and their daughter and only child, Mildred McCoy, were found on the McCoy farm in Fayette Co., Ohio. Elmer McCoy and Mildred McCoy had been shot in the back of the head. Forrest McCoy had been shot six times, twice in the head, in the left breast, in the lower part of the ribs on the left side, in the left side of the abdomen and in the upper abdomen to the right.

The defendant was a brother-in-law of Elmer McCoy, their wives being sisters. There was no showing of any ill feeling between the families. On the contrary, the record discloses a cordial relationship. The male members of the family had been together on a hunting trip and the sisters had visited on the McCoy farm on the Saturday before Thanksgiving and plans had then been completed for another gathering at the McCoy farm on Thanksgiving Day. Pursuant to this arangement, the defendant, his wife, their son, his wife and their daughter came to the McCoy farm after the bodies had been found.

No motives appear for the murders except those which are claimed to have been stated by the defendant himself, namely, to George Ekerman, Lieutenant of the Bureau of Detectives of Toledo, that he and Elmer McCoy quarreled over rent which McCoy owed defendant's wife as part owner of the McCoy farm, and to his son, Thomas, that he killed Elmer McCoy to get a home for him (the son).

Defendant at the time of the murders was sixty years of age, a farmer, having lived on a farm all of his life. He was educated in the common and high schools and conducted his own business.

In 1937, defendant fell off a load of hay, which according to his doctor, injured his neck, shoulder and knee, after which because his physician thought that he had "a slight injury to the lateral processes in the base of the neck" he was sent to a doctor in Cincinnati who made him a collar to wear, to relieve what seemed to be neuralgia of the neck; that he had had trouble since his fall with his right shoulder "some people might call it arthritis"; that he was of a nervous temperament; that she prescribed a tonic for him on the day before Thanksgiving. The defendant and his wife testified that he had lapses of memory and he, that he suffered from prostate gland trouble.

Shortly after the murders, the Sheriff interviewed the

defendant and was not satisfied with his explanation of his whereabouts from about 7:30 to 10:30 on Wednesday night, Nov. 24, 1943.

The further facts admitted or not denied by the testimony are, that on Tuesday, Nov. 30, 1943, about 10:30 in the morning, the Sheriff arrested the defendant, without warrant, and placed him in the county jail, saying to him, that it was the judgment of the Sheriff that it would be necessary to take him into custody. Sometime during that day, inquiry was made of the defendant whether he would be willing to subject himself to a test by a "lie-detector".

It does not appear that the defendant had lunch on this day but he had his evening meal. Sometime after midnight, the Sheriff says about 2 A. M., the defendant with the Sheriff, Prosecuting Attorney of the county and a newspaper man, left the jail in the Sheriff's automobile and traveled to Toledo, a distance of 173 miles. The parties stopped two times on the way to eat and once, at least, to let the defendant out of the car to urinate and upon arriving at Toledo, between 7 and 8 A. M., had breakfast. The defendant had nothing more to eat during the day until after 7 o'clock in the evening.

The defendant was introduced to George Ekerman, Lieutenant, and to Arthur Eggert, Captain of Detectives of the Bureau of Detectives in Toledo, and at about 9:30 in the morning of the 1st of December was taken to what is known as the "polygraphic room" at detective headquarters in the city building, in which was located the "polygraph" or "lie-detector". This room was well furnished, provided with comfortable chairs and properly ventilated. The wall of this room, at least on one side, was not transparent from the inside but from the outside the occupants of the room could be seen and heard. The polygraph was explained to the defendant by Lt. Ekerman. It is adjusted by means of a chain around the chest and back and by an elastic band around the wrist. There is no particular discomfort when the machine is being operated in actual tests and during the interim between tests there is no objectionable pressure on any part of the body.

During the day Collett was interrogated in the main, by Ekerman, at times, when he would leave the room, by Eggert. The Sheriff was seldom in the room during the day and, prior to the claimed confessions, did little questioning and the Prosecutor was not in the room and took no part in the

proceedings. The oral statements, characterized as confessions, were made sometime in the afternoon, probably 4:30 or 5:00 o'clock and the written statement or confession was prepared after that time, probably at 5:35 P. M. It does not appear that the defendant left the polygraph room during the day. He says that he did not and no witness testifies that he did.

After the signing of the confession, defendant was taken to the city prison, first placed in a cell and later removed to a hospital ward where he spent the night. He was served with food in the evening after he had been placed in the jail, the food being sent to him by the Sheriff. There is no evidence and it is not claimed that the defendant, at any time, was physically abused by being struck or beaten.

On Thursday, Dec. 2, in the morning, the Sheriff, the Prosecutor, the defendant and another man, not connected with the case, left the Toledo jail and next stopped at London where the defendant was placed in the Madison County jail over night. The Sheriff says that this arrangement was made because the defendant did not want to be returned to the Fayette County jail that night. There is no claim of mistreatment of any kind during the return trip from Toledo nor while in the Madison County jail.

On Friday, Dec. 3rd., Ekerman met the defendant in London and later in the day they and the Sheriff went to the defendant's home and there met the defendant's son, Thomas, and defendant's lawyers, Smith & Kirk. A search was made for guns, presumably those that had been used in the killing of the McCoys but none was found. Later in the day the defendant was again taken to the Fayette County jail and charges were filed against him before a Justice of the Peace. He was arraigned, waived hearing and was bound over to the grand jury on Saturday, the 4th of December, in the afternoon.

The facts in dispute in varying degrees, are: the conditions under which the defendant was taken to Toledo. The Sheriff testifies that upon inquiry of the defendant if he would subject himself to the lie-detector test, he not only was agreeable that it be done, but was eager that it be made, and offered to pay the necesary incidental expenses therewith. The defendant does not support this testimony in its entirety but it may be fairly said that he did not oppose the test. He says that he thought he was to be taken to Columbus. The State's witnesses do not admit this. The Sheriff and the detectives testify that no undue pressure was applied to

the defendant to cause him to make his oral and written confessions; that he was subjected to no threats, promises or inducements which would cause him to admit he was responsible for the crimes charged. The detectives do not say that he left the room to go to a toilet but that he made no such request and that had he done so, he would have been accorded that privilege. They say that the language in the written confession is that of the defendant, was not framed by the detectives, or either of them, or the Sheriff.

The defendant testifies that although he had the opportunity to eat on the trip to Toledo and after he reached there, he ate little or nothing; that the trip was rough and affected him physically, especially his neck as he was not wearing his protective collar; that because he suffered from prostate gland disability, the automobile being cold, it had the effect of causing him to desire to void urine frequently and that during the questioning he had frequent desire to urinate and that because he was denied this relief, he suffered greatly; that during the questioning in Toledo, the detective Eggert informed him, in a rather low tone of voice, that "you will have to stay in that chair or I will have to get rough with you" and later Eggert said to him that nobody left that room without signing something. Both of these statements are expressly denied.

The defendant further says that Ekerman stated that he (Collett) had been framed, that the stage had already been set for him before he arrived and that his car had been fixed in some way or other. That no man at his age ever was caused to suffer the extreme penalty for murder; that he, Ekerman, would guarantee defendant he would never have to be imprisoned more than a year and a day in an asylum; that if he confessed they would call in a judge from Fayette County, a judge from Clinton County and a doctor and without public hearing consider his case and determine the punishment, and that it would not be longer than a year. Thus, all publicity would be avoided and his family would be saved the embarrassment that would attend a public trial. All of this is categorically denied by the detectives.

The detectives admit that they discussed many cases involving charges of crime against individuals, the proceedings incident to trials of the cases and the culmination thereof and that the defendant was questioned persistently and at length concerning many phases of the McCoy murders, his knowledge thereof and his connection therewith.

Ekerman states that the morning after the written confession was signed, he talked to the defendant about the guns with which Elmer McCoy was shot and that he, the defendant, told him that he knew exactly where they were and that he could find them on his farm; that it was agreed that he, Ekerman, should go with the defendant to locate the guns and that, pursuant to this arrangement, the search was made.

The defendant claims that the whole story respecting the guns, their hiding and the place where they would be found was the creature of Ekerman's mind, that the defendant knew nothing whatever about any guns or where they were located and that the statements that he made to his son, Thomas, were uttered pursuant to the suggestion of Ekerman.

Ekerman also says that in discussing the guns, the defendant inquired if it were possible by the number and type of a revolver to trace the ownership, to which the detective replied that it was and that it had been done. The search for the guns was fruitless and they have not been recovered.

It thus appears that if the testimony of the defendant be accepted at full value, the confessions at Toledo were secured not only by threats but by promises and inducements which had a tendency to and, no doubt, did cause him to divulge the information therein set forth.

On the other hand, upon the evidence adduced by the State, there were no threats, promises or inducements held out to the defendant to cause him to confess nor was he subjected to any mistreatment which would have the effect of materially reducing his ability to realize and appreciate all the consequences of his acts. This is a familar pattern in the trial of criminal cases, which authorizes and requires that the factual questions for determination as to the admissibility of a confession, shall be decided first, by the trial judge, and finally, by a jury.

When the defendant objected to the reception of the confessions in evidence, the trial judge excused the jury before permitting any statement to be made to them and the preliminary issue was fully considered. The testimony adduced on this hearing was almost as complete on the subject as it was when presented finally to the jury. The trial judge meticulously protected the rights of the defendant respecting the admissibility of the confessions.

Since the early case of **Spears v State of Ohio, 3 Oh St 584**, the course of a trial judge respecting the admission of a confession has been charted. The syllabus of the case is precise in announcing the rule which a trial judge must follow in determining the admissibilty of a confession. This pronouncement has been followed and cited with approval and without differentiation by our state courts. The trial judge at the conclusion of the preliminary hearing decided that the confessions were admissible. It must be assumed, because there is nothing to the contrary, that he followed Spears v State and that he was not satisfied upon the facts that the confessions were produced by "representations or threats". This determination was not conclusive against the defendant and the same question was properly presented to the jury upon the charge of the court to which no objection is interposed.

It is claimed that, as a matter of law, the confessions were not voluntary, and that, if they be held to be voluntary, they should not have been admitted because secured while the defendant was in custody of police officers and before he was arraigned.

It is claimed that the third degree was practiced upon the defendant. The confessions in this case are the sine qua non and without them, it clearly appears that the verdict and judgment could not stand. We, therefore, are mindful of the vital import of the legal questions presented by the third assignment of error.

Under the law in Ohio at the time of the trial of this cause the confession must be held to be voluntary under the evidence in the light of the verdict and the judgment returned. The tests respecting a claim that a prisoner has been coerced into making a confession are, first, was any violence used upon him or threats or promises made to him and, second, if so, what was the effect of these acts upon his free will. If they overcame it, then the federal and state constitutions were violated and he is compelled to be a witness against himself but, if notwithstanding the fact that there may have been some violence or threats or promises, it fairly appears that he voluntarily admitted the commission of a crime, such confession is admissible against him.

In **Snook v State, 34 Oh Ap 60**, this court at considerable length considered and discussed the admissibility of the confessions there involved in the light of Spears v State. It was there claimed that the defendant had been

physically abused. We expressed our opinion of the third degree at page 76 of the opinion and now subscribe to that pronouncement without qualification.

It is true that, in instances, police officers have resorted to the third degree and while this procedure is commonly associated with physical violence practiced upon a prisoner, it also includes any conduct which overcomes the prisoner's normal ability to resist, whether accomplished by physical or mental fatigue, fear, threats or promises. The practice of the third degree has, in the judgment of the writer of this opinion, resulted in as many improper acquittals as it has in improper convictions. The practice of anything that can be characterized as the "third degree" should be so carefully avoided that even to suggest in a court that it has been employed will be recognized as ridiculous and unfounded.

We have not come to the place in our criminal jurisprudence that, whenever the issue is the admission of a purported confession secured by police officers while the prisoner is in their custody, their testimony on the subject is, therefore, to be disbelieved. Here, if the State followed only the procedure as testified by its witnesses, there was no third degree employed.

The first law of nature is that of self-preservation. One charged with a crime involving liberty and possibly his life, may resort to any claim that may relieve him from suffering such a penalty. Prisoners, against whom no questionable practice has been indulged, may concoct stories tending to establish that they are victims of the third degree. Out of this common experience has grown the legal principle that, upon conflicting evidence, the jury should be accorded the right to make decision as to where the truth is to be found.

We would not, at such length, have indulged in the foregoing observations, which are but a restatement of principles well recognized by every judge and lawyer, but for the disconcerting effect of several opinions of the United States Supreme Court recently released, some since the trial of this case, and cited and commented upon in the briefs and largely relied upon by counsel for defendant. These cases are:

McNabb, et al. v United States, Mar. 1, 1943, 318 U. S. 322, 63 S. Ct. 608, 87 L. Ed. 819; Rehearing denied, June 7, 1943, 319 U. S. 784, 63 S. Ct. 1322, 87 L. Ed. 1727. Anderson, et al. v United States, Mar. 1, 1943, 318 U. S. 350, 63 S. Ct.

599, 87 L. Ed. 829. United States v Mitchell, 322 U. S. 65, 64 S. Ct. 896, 88 L. Ed. 812. Ashcraft, et al. v Tennessee, 322 U. S. 143, 64 S. Ct. 921, 88 L. Ed. 858.

Where state courts have full jurisdiction to pronounce final judgment, they are not bound by the adjudications of the United States Supreme Court, but decisions of that court on federal questions are absolutely binding on state courts, 21 C. J. S. 360, 365.

The pronouncements in the McNabb, the Anderson and the Mitchell cases are not binding on this court. They have, however, great persuasive power by reason of the authority of the court and the logic of the underlying reasons supporting the judgments. In the Anderson and McNabb cases the court held that the confessions were not admissible in trials in federal courts, under the rules of evidence there controlling.

Though the cases are much alike, the McNabb case, first decided, is much more extensively considered. The opinion was rendered by Associate Justice Frankfurter. There are factual differences in the McNabb and the instant case but there is marked similarity in many phases of the evidence relating to the confessions. The Court had under consideration the Federal Law, 48 Stat. 1008, 5 U. S. C. Par. 300, 5 U. S. C. A. Par. 300a which is somewhat different in phraseology from the Ohio Code and provides in part:

"The person arrested shall be immediately taken before a committing officer."

Our statute, §13423-3 GC, provides:

"When a peace officer has arrested a person without a warrant, he must without unnecessary delay, take the person arrested before a court or magistrate having jurisdiction of the offense, and must make or cause to be made before such court or magistrate a complaint stating the offense for which the person was arrested."

From which it follows that the Sheriff, in this case, as did the police officer in the McNabb case, acted illegally in taking the defendant into custody and in restraining him without a warrant, and in failing to take him before a magistrate for arraignment, within reasonable time after

his apprehension. Nor is there any question of the right of the defendant to confer privately with his own legal adviser, at all reasonable times. Snook v State, supra. The defendant says, that he informed the Sheriff he wanted his attorney before he went to Toledo and during the time they were there. The Sheriff testifies that he, for the first time, asked for a lawyer after the signing of the confession.

The opinion in the McNabb case expressly states that the question arising under the "due process" clause of the federal constitution is not considered. The opinion is long but the conclusion of the Court was reached, not only upon the illegality of the acts of the officers in failing to take the prisoners immediately before a committing officer, but also, upon the probabilities that the confessions were involuntary. At page 612 of the opinion (S. Ct. Rep.), it is said, that the admissions made by the accused constituted the crux of the Government's case against them and that the convictions "cannot stand" if such evidence be excluded. "Then the question is were they properly admitted." In a later order denying a motion for leave to file petition for rehearing, it is said:

"As the case is for retrial in the district court, it will be open to all parties to adduce all evidence relevant to the admissibility of the confessions, whether adduced in the previous trial or not."

This, to us, seems inconsistent with that part of the opinion, at page 612, to which we have made reference.

In United States v Mitchell, supra, the court restated the proposition "that the mere fact that a confession was made while in the custody of police does not render it inadmissible" and reversed the judgment of the United States Court of Appeals for the District of Columbia, reversing a conviction grounded, in the main, upon a confession made by Mitchell soon after he was taken into custody but before his arraignment. The opinion was based upon the fact that there was no showing that the failure to arraign the prisoner had any causative effect in producing his confession. It seems to this court, that therein is found the essential question to be determined, viz., what effect, as a matter of fact, did the delay in the arraignment of the prisoner have in bringing about the confession?

Ashcraft v Tennessee, supra, unlike the other cases which we have considered, was a review of a conviction of crime in the state court of Tennessee. Ashcraft, the husband of the slain woman, and Ware were convicted of her murder. Both defendants made admissions which were admitted as confessions. The convictions were supported by the state courts and on writ of certiorari the cause was brought to the United States Supreme Court and there reviewed and reversed because of the violation of the due process clause of the Fourteenth Amendment to the federal constitution. The court held that the confession was coerced and Justice Black, who wrote the opinion, says such determination was reached upon the undisputed facts.

The conditions under which the confession was secured are set out by the Tennessee Supreme Court, as follows:

"They took him (Ashcraft) to an office or room on the northwest corner of the fifth floor of the Shelby County jail. This office is equipped with all sorts of crime and detective devices such as a fingerprint outfit, cameras, highpowered lights, and such other devices as might be found in a homicide investigating office. * * * It appears that the officers placed Ashcraft at a table in this room on the fifth floor of the county jail with a light over his head and began to quiz him. They questioned him in relays until the following Monday morning, June 16, 1941, around nine-thirty or ten o'clock. It appears that Ashcraft from Saturday evening at seven o'clock until Monday morning at approximately nine-thirty never left this homicide room of the fifth floor."

Justice Black continues:

"testimony of the officers shows that the reason they questioned Ashcraft 'in relays' was that they became so tired they were compelled to rest. But from 7:00 Saturday evening until 9:30 Monday morning Ashcraft had no rest. One officer did say that he gave the suspect a single five minutes respite, but except for this five minutes the procedure consisted of one continuous stream of questions."

The opinion then points out, that what occurred during the secret thirty-six hours examination is in hopeless conflict.

We have recited enough controlling facts in the Ash-

craft case to indicate that the ordeal to which Ashcraft was subjected was much more severe and greater in its tendency to break down his physical and mental resistance than in the instant case. Here, it fairly appears that, with few exceptions, the defendant was with one detective only and his questioning was probably not continuous. He had several respites, he was not subjected to any high-powered light shining in his eyes, he was comfortably seated and the period of questioning covered only aproximately nine hours. Upon his own statement the lie-detector failed in the demonstration test of which he had knowledge. Thus, at the inception of the questioning, he felt that it was without efficacy to detect any untruth that he might state.

The opinion in the Ashcraft case gave much weight to what it termed the "secret inquisitorial practice".

Justice Jackson, in a vigorous dissent says of the judgment:

"It substitutes for determination on conflicting evidence the question whether this confession was actually produced by coercion, a presumption that it was, on a new doctrine that examination in custody of this duration is 'inherently coercive'; it makes that presumption irrebutable, i. e., a rule of law * * *; it sets aside the findings by the courts of Tennessee that on all facts this confession did not result from coercion, either giving those findings no weight or regarding them as immaterial."

It is evident from the dissent that the Judges participating therein believe the Ashcraft judgment marks a radical departure from long established precedents of the Supreme Court of the United States.

The pronouncement in the Ashcraft case is binding upon this Court as to the federal question involved but, of course, is predicated upon the facts appearing in that case.

It is our judgment, that the facts do not so closely parallel those in this case as to require us to say, as a matter of law, that the confessions here were secured in violation of the Fourteenth Amendement of the Federal Constitution or the Tenth Amendment to our State Constitution.

The Ashcraft case did not expressly overrule Lisenba v People of State of California, 314 U. S. 219, 62 S. Ct. Rep. 280, in which two propositions of the syllabus are as follows:

"17. The Fourteenth Amendment leaves California free to adopt, by statute or decision, and to enforce such rule for determining admissibility of confession as she elects, whether it conforms to that applied in federal courts or in other state courts, but the adoption of the rule of her choice cannot foreclose inquiry regarding whether, in a given case, the application of that rule works a deprivation of prisoner's life or liberty without due process of law.

22. Where the evidence regarding the methods employed to obtain a confession is conflicting, and where, although denial of due process was not in issue in the trial, an issue has been resolved by court and jury which involves an answer to the due process question, the United States Supreme Court in determining issue of denial of due process of law accepts the determination of the trier of the facts unless it is so lacking in support in evidence that to give it effect would work that fundamental unfairness which is at war with due process."

Illegal delay in arraignment after arrest, for the purpose of securing a confession, is held not to render the confession inadmissible in People of the State of New York v Michael Alex, 94 A. L. R. 1033, which is the subject of annotation, at page 1036, wherein are cited cases from several states supporting the holding in the principal case.

In Sharkey v The State, 4 O. C. C. 101, this district, the State, against the objection of the defendant, was permitted to introduce a confession made by him while in the custody of an officer, but before a warrant had been issued for his arrest. The court held that, notwithstanding this fact, the confession was properly held to be voluntary.

We do not find the third assignment of error well made.

### WEIGHT OF THE EVIDENCE

The only principal question left is that of the weight of the evidence. We have necessarily considered this claim in part in the discussion of the other errors assigned.

The trial judge who had the opportunity to see, hear and observe the witnesses, which is not afforded this court, found that the verdict was not contrary to or against the manifest weight of the evidence. The jury by its verdict accepted the testimony of the State's witnesses upon the determinative issues of fact.

There is marked conflict upon the material controlling question of the alibi of the defendant and if his statements in the confession are true then this defense must be resolved against him. The jury may have considered his testimony, respecting the confessions, unreliable because it found some of his statements improbable and not to be reconciled with other facts which were undisputed.

It is urged that the confession, if accepted, did not establish the defendant's guilt because it stated that the killing was done in self-defense. But the theory of the self-defense was that Elmer McCoy had a revolver and that he had a club or a fork handle with which he attempted to strike the defendant. The physical facts refuted this version of the killing of Elmer McCoy because when found, there was no revolver, club or fork handle near him, he was shot in the back of the head and fell in a position which tended to refute the claim that he had made an attack.

Some statements which the jury may have felt to be unusual and unreasonable were those attributed to Ekerman, that he (the defendant) was in the hands of a political ring, had been framed and that the stage had already been set for him before he was arrested. The promises claimed to have been made by Ekerman that if an admission of guilt was made, the defendant would not be required to face a public trial. That he would appear only before one judge from Fayette County, one judge from Clinton County with a doctor and that Ekerman would guarantee that in any event he, the defendant, would not be required to serve more than one year. His claim that the acts of the detectives had brought about his confession in the light of the testimony of Sheriff Icenhower, that when Ekerman was out of the room and the defendant was alone he heard him soliloquizing "they have got me, I am gone, Jimmy you went too far this time". The statement that he gave no facts to the detectives respecting the guns, their location or where they could be found; that all of this information originated with Ekerman.

But, far more persuasive against the defendant is the fact that, when he had returned to his own farm, in the presence of his own attorneys, and with the abiding assurance that he was then with his relatives and friends, he admitted to his own son, upon his questioning, that he had killed Elmer McCoy and later made substantially the same admission in the presence of his counsel.

It fairly appears from this evidence that the defendant whatever his physical afflictions, is not of low mentality nor lacking in education but on the contrary is a well informed, intelligent, alert individual. No witness on the stand showed more ability to recount in detail the occurrences in which he was involved than he. He does not appear to be the type of person who would readily be susceptible to influences which would overcome his will. Apparently, he had much confidence in his own ability to take care of himself. The Sheriff had been his life-long friend and it does not appear that he in any way mistreated him.

We emphasize the foregoing circumstances tending strongly to support the jury in accepting the confessions and in reaching the verdict which it was its province to return. It is our obligation to support this verdict if upon any reasonable hypothesis it may be done. **McHugh v State, 42 Oh St 154.** We are not unmindful of the favorable inferences which could be indulged to support a verdict of acquittal had the jury so acted.

The record is convincing that the defendant had a fair trial by a jury of his peers; that he was ably represented by counsel, and that the trial judge accorded him full protection in all of his rights.

We find no error intervening to the prejudice of the defendant which would require a reversal of the judgment. It will be affirmed and cause remanded.

GUERNSEY, J., concurs.

GEIGER, J., dissenting:

I regret that I am not able to concur in the judgment of my associates as expressed in the majority opinion. It would be idle for me to go over all of the details of this case which have been comprehensively presented in the majority opinion. I may have, in my own mind, doubts as to the validity of the so-called confession but waive this for reasons given by Judge Hornbeck.

I am, however, definitely committed to the conclusion that there has been in this case prejudicial error, and I will note my reasons as briefly as possible.

**Sec. 13437-2 GC,** recites what shall constitute a sufficient indictment. The first sentence is:

"The indictment or information is sufficient if it can be understood",

enumerating five particulars, of which 4 and 5 are especially applicable.

**Sec. 13437-6 GC** provides the forms in charging offenses, stating:

"The following forms may be used in the cases in which they are applicable, but any other forms authorized by this or any other law of this state may also be used, and other brief and comprehensive forms applicable to other offenses may be used."

. In the section cited there are fifteen different forms prescribed beginning with "adultery" and ending with "robbery". The form prescribed and used in the case at bar for murder in the first degree is as follows:

A. B. unlawfully, purposely and of deliberate and premeditated malice, killed C. D.; or A. B. did unlawfully, purposely and while in the perpetration of (or attempting to perpetrate) a burglary, kill C. D."

The last paragraph of the section is to this effect:

"Provided, that the prosecuting attorney, if seasonably requested by the defendant, or upon order of the court, **shall** furnish a bill of particulars setting up **specifically** the nature of the offense charged." (Emphasis mine.)

It is admitted in this case that the prosecuting attorney was seasonably requested by the defendant to furnish a bill of particulars. The Judge, presiding at the trial, denied the request of the defendant for reasons stated in his opinion.

Before the adoption in 1929 of the present statute providing for the short form, which was used in this case, the Supreme Court, in the case of **State v Boyatt, 114 Oh St 397,** passed upon the question of the right of a defendant to have a bill of particulars. It was held that "under the General Code, the State cannot be required to file a bill of particulars in criminal cases". Allen, J., rendered a very concise and clear opinion. She stated on page 399:

"The attorney for the defendant, however, claims that he is entitled to have the motion for the bill of particulars granted upon the ground that the defendant is entitled to be apprised of the nature of the charge against him. Under

the decisions in this state, however, the defendant's rights in that particular are amply protected by the holdings with regard to the requisites of the indicment. This court has decided that an indictment must contain a complete description of the offense charged, and that it must state every circumstance of an intention, knowledge, or action that constitutes the crime."

Further, on the same page:

"Therefore the defendant, under Ohio law, due to the **requisites of the indictment,** is given all that he legitimately can ask as to being apprised of the nature of the crime." (Emphasis mine.)

The present statute became effective in 1929, three years after Judge Allen's opinion. It provided, in substance, short forms for indictments which did not contain all the matters that the Court had held were essential to a proper indictment as set out on page 399.

As a protection to a defendant and as compensation to him for the requirement that he proceed to trial under the short form provided in said section, there is the provision that there shall be furnished by the prosecuting attorney a bill of particulars "setting up specifically the nature of the offense charged".

In the Boyatt case the Court passed upon the old form of indictment and held that the bill of particulars did not make more definite and certain the indictment which was already specific.

The Legislature in agreeing that short forms of indictment might be used, felt that it was only just to the person charged that a bill of particulars be provided which would furnish the defendant the specific matters which the longer form of indictment used prior to the passage of the statute made obligatory. I do not concede that any Court trying a defendant has a right to say, in the face of the provision of the statute that if, seasonably requested, the defendant may be denied the right to be informed of those facts which in his judgment are essential to make the charge specific and to enable him to meet the evidence of the State which must be confined within the limits of the bill of particulars. I do not believe that it is within the province of the Court to tell the defendant that in spite of his request and belief that he should have more definite statements which may be furnish-

ed by a bill of particulars, that he is not entitled to such a bill of particulars. In the case at bar it became very important to the defendant to ascertain the exact time when the offense is claimed by the state to have been committed, because he had the definite and declared intention of asserting an alibi. It is not for the Court to say, "You have made a confession in which you have stated the time of the occurrence, which is now charged against you in the indictment, and therefore you are not entitled to a bill of particulars". The statute is certain, definite and specific and should not be nullified by what a court may think of the request or of the necessity of having specific information. The Judge writing the opinion has twice stated in the opinion that the refusal to furnish this information by way of the bill of particulars was error, but that the same was not prejudicial.

It has been suggested that the statute permitting short forms would be nullified if the defendant could demand a bill of particulars setting up **specifically** the nature of the offense charged. The statute permits short forms and, no doubt in the great majority of cases, no bill of particulars would be requested, and the purpose of the statute in simplifying procedure would be, in a large measure, accomplished. But, when the defendant requests a bill, the prosecuting attorney **shall** furnish same. This is the provision of the statute.

The present case is of supreme importance to defendant and every protection provided by the statute should be scrupulously accorded to him. While the crime committed was atrocious, and its perpetrator should justly suffer the extreme penalty, yet all right thinking citizens must concede that before conviction he should have the full protection of the law.

I, therefore must dissent, basing the same not upon what I regard as rather flimsy evidence as to the validity of the confession, but solely because the defendant in his own judgment and within the time prescribed by the statute, requested information which the statute positively says must be furnished to him and which was refused.

I can readily conceive that if the view taken by the trial court is to be endorsed, that trial courts will be led to the denial of a bill of particulars because the court in its own mind has some reason that is satisfactory to it.

I therefore dissent from the judgment which affirms the judgment of the Court below.